### LAWRENCE et al. v. SUDMAN et al.
### Civ. 25-177.

District Court, S. D. New York.
June 21, 1945.

Isadore Shapiro, of New York City (Lazaar Henkin, of New York City, of counsel), for plaintiffs.

White & Case, of New York City (Lowell Wadmond, and Philip H. Weeks, both of New York City, of counsel), for defendants.

BRIGHT, District Judge.

The plaintiffs, until September 20, 1940, were employees and until September 23, 1940, stockholders of Black Diamond Lines, Inc. Defendants were the owners of 94,-500 shares of the common stock of that corporation (which consisted of 100,-000 shares, par 5¢), and from December 13, 1939 were the sole directors and officers thereof. Plaintiffs and eight other employees were the owners of the other 5,500 shares, each of the plaintiffs owning 500 thereof.

The amended complaint alleges claims under three counts. The first count is, that at or about the time plaintiffs became the owners of such stock, each gave to certain of the defendants (who have been and will be called "executives") an option to purchase, at "the book value or net equity of the shares as shown on the regular audited balance sheet of the corporation for the quarterly period just preceding the quarterly period in which the purchasers give notice of their election to purchase", for a period of six months after the happening of any one of three events, one of which was the "termination of such seller's employment with Black Diamond Lines, Inc. * * * in any manner or for any reason

whatsoever"; that defendants dominated and controlled the affairs of the corporation to the complete exclusion of the minority stockholders; that they gave notice of plaintiffs' discharge on September 20, 1940; on September 23, 1940, the defendant Sudman, acting for the other defendants, falsely and fraudulently stated and represented that, for the good of the corporation and in order to protect its interest and that of its stockholders, defendants had decided to dissolve the corporation, to facilitate which it was necessary for them to obtain the stock of the minority stockholders, that the business would be reorganized and the minority stockholders given an equivalent interest therein; and that the value of the stock was $4.38 per share. Relying upon said statements, each of the plaintiffs transferred his stock, cancelled the option agreement and released defendants from any claims arising thereunder. It is further alleged that on September 27, 1940, the corporation declared a dividend of $4 upon each share, transferred to the defendants the title to eight ships (for the sale of which it had been negotiating for some time prior to September 30, 1940), and the majority of its other assets, and shortly thereafter sold the eight ships for a total of $3,970,000. It is further alleged that defendants fraudulently concealed the negotiations for the sale of the ships and that the corporation had sufficient surplus to declare the $4 dividend, and that the value of the assets of the corporation, as shown upon its books, did not represent the true value thereof. By reason of these allegations, plaintiffs elect to rescind the sale of their stock, offer to repay the amount received by them, and each seeks the sum of $50,000 as damages. The second count alleges a conspiracy to defraud plaintiffs of their stock by means of the representations and in the respects set forth in the first count, in furtherance of which plaintiffs were discharged without any justifiable grounds and solely for the purpose of enabling the exercise of the options; and that immediately after the transfer of the stock by the plaintiff Lawrence, he "was re-employed by the corporation as of September 23, 1940 in his former capacity as auditor". It prays for the same relief as in the first count. The third count realleges most of the allegations of the first, and asks damages for each plaintiff in the sum of $100,000.

At the close of plaintiffs' case, plaintiffs moved to sever the action as against the defendant Morton, which motion was granted. Then they asked, under Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to conform the pleadings to the proof. Upon being requested to state in what respects they desired to conform, replied that, in addition to the allegations in the complaint, they also desired to add the claims that because of the fiduciary relationship that existed between the parties prior to and throughout the existence of the corporation, and at the time of the exercise of the option, it was improper for the defendants to exercise the option under the circumstances that prevailed in the summer of 1940, when the defendants knew that the actual value of a share of the corporation was many times more than what it was carried on the books of the corporation, and what these plaintiffs were paid, that it was improper for them to dissolve the corporation, or liquidate it or to distribute its assets; and if they decided to dissolve or liquidate, they were bound to distribute the assets pro rata among all the stockholders, and had no right to exercise the option for the sole purpose of getting rid of the minority and then share the money among themselves. They ask judgment for such relief as they may be entitled to, regardless of that demanded in their pleading. Rule 54(c).

The facts, except in so far as the occurrences on September 20, and September 23, 1940 are concerned, are not in dispute. The Black Diamond Lines, Inc. was incorporated on October 20, 1937. It succeeded to the assets and business of the American Diamond Lines, Inc. (which owned the eight ships in which we are interested) and the Black Diamond Steamship Corporation, its operating subsidiary. American Diamond had been financed, and was controlled, by the Securities Corporation of the New York Central Railroad Company and A. Iselin & Co. The Securities Corporation owned 12,000 shares of preferred

stock of American Diamond (par $50), and Iselin & Co. 12,000 of preferred and 86,000 of common. The executives had been engaged in the business of these corporations for many years prior to the date of the incorporation of Black Diamond Lines, as had also the two plaintiffs. In the fall of 1937, Iselin insisted upon withdrawing from the business and that the executives, or one or more of them, purchase its stock interest. This was finally accomplished by a bank loan to Black Diamond Lines on collateral notes endorsed by the defendant Sudman, with the proceeds of which the Iselin preferred and common stock were purchased by Black Diamond Lines at $50 for the preferred and $7.50 for the common, a total of $1,245,000. Black Diamond Lines was authorized by its charter to issue 6,000 shares of preferred, $100 par, and 100,000 shares of common, 5¢ par. The preferred stockholders of American Diamond had the right to elect a majority of the board of directors and did so. With the Iselin interest now out of that corporation, the Securities Corporation of the New York Central agreed to exchange its 12,000 shares of American Diamond preferred, par $50, for the 6,000 shares of Black Diamond Lines preferred, par $100, but upon the same condition, that so long as the preferred stock was outstanding the Securities Corporation should have the right to elect a majority of the board of directors, and it did so. That exchange was made. Ninety-five per cent. of the common stock of Black Diamond Lines was subscribed for and ultimately owned by the executives, and the remaining 5,000 shares, or the major portion thereof, by employees of the corporation, among whom was the plaintiff Lawrence, who received 500 shares and paid therefor $25. Black Diamond Lines started to function on or about February 11, 1938, the ships and assets of American Diamond were transferred to it, and American Diamond was later dissolved.

When the plaintiff Lawrence, along with other employees, was given the opportunity to subscribe for common stock of Black Diamond Lines, it was upon the express condition that each of them execute to the executives the option to sell previously mentioned. Carrying out this arrangement, Mr. Lawrence and eight other employees, on January 11, 1938, executed the option in question.

The option agreement of January 11, 1938, around which in part this action revolves, had other provisions which seem of some importance. It was signed by the owners of all of the common stock of Black Diamond. The defendants, other than Morton, together with Francis E. Huck, since dead, were designated as purchasers, and the defendant Lawrence and eight other employees, including Morton, as sellers. The sellers agreed not to sell, hypothecate or encumber their shares of common stock without offering the same to the purchasers, and granted the option to purchase for six months after the happening of the three events, one of which is quoted above. Until American Diamond shall have been dissolved, the price to be paid was 5¢ per share, and thereafter, the book value or net equity previously referred to. It further provided that the book value or net equity of the shares as fixed by the Board of Directors for any quarterly period, should be conclusive upon the parties to the agreement; the certificates of stock issued to the sellers should be endorsed with a legend that the certificate was subject to the terms of the agreement, "and may be pledged, sold or otherwise transferred only subject to the terms of said agreement." Any one of the executives named in the option was authorized to exercise it.

Prior to the signing of that option, Lawrence had executed and delivered to American Diamond a somewhat similar agreement. It recited that he was an employee of that corporation which desired to assist him to acquire an interest in it in recognition of and as an award for services rendered, and in order that he might share in its profits, and for that purpose, had made an advance to him to assist him in acquiring voting trust certificates for 100 shares of its common. In consideration of the granting of that option, the corporation was willing to cancel plaintiff's indebtedness by reason of the advancement which the corporation did.

Plaintiff delivered to the corporation the voting trust certificate upon the understanding that it should be held by the corporation until its time to exercise the option had expired, and granted an option to the corporation to purchase the certificate if Lawrence's employment "shall terminate for any purpose, whether by expiration, resignation, discharge with or without cause, the winding up or liquidation of the corporation or for any other reason, providing a notice of the desire to exercise the option should be given within 30 days before or after such employment shall cease. The price to be paid was $2.50 per share for the first five years, $5 per share within the second five years, and $10 thereafter.

It is clear that this option, and a number of other agreements of somewhat similar tenor, were executed by the several parties interested, all of whom were executives and employees of the corporation, for the purpose of keeping the ownership of the stock in those who were actively engaged in the business and contributing to the effort, and to prevent the possibility of others, not so engaged and possibly competitors, becoming the holders thereof. The option and the other papers substantially recite that.

The plaintiff Deuber, on December 23, 1938, was given 200 shares of Black Diamond Lines common stock by the defendant Sudman, upon the same condition as that attached to the Lawrence shares. He executed to the executives an option agreement which was in terms almost exactly similar to that executed by Lawrence. On or about January 26, 1940, Mr. Deuber, upon the same condition, was given the opportunity to subscribe to 300 more shares of Black Diamond Lines at $5 a share (which was the price which the executives had had to pay for the stock of Francis E. Huck, who had been one of them and who had died on June 7, 1939). He did so along with two other employees. That option expressly confirmed the option previously signed by him on December 23, 1938, and contained provisions almost exactly similar to the other, except as to price and the consideration for the execution of the option. The money with which to purchase these shares of stock was supplied to him by dividends and bonuses which were voted by the corporation.

The principal business of the Black Diamond Lines and its predecessors had been in the operation of these eight freight vessels from the North Atlantic ports of New York, Boston and Baltimore to the north channel ports of Antwerp and Rotterdam. The breaking out of World War II in September 1939, bid fair to, and ultimately did, interfere with that operation. The President had then declared a limited emergency; and on November 4, 1939, pursuant to the Neutrality Act, 22 U.S.C.A. § 441 et seq., about that time adopted by Congress, had prohibited all American flag vessels from operating in the belligerent areas, which included that portion of the English Channel around the two ports of Holland and Belgium mentioned.

The board of directors of Black Diamond Lines, then composed of three directors elected by the Securities Corporation and Mr. Sudman, discussed the advisability of selling the eight ships, and it was definitely decided that they would not but would charter the vessels out to others for operation in non-belligerent zones.

The only manner in which the Black Diamond Lines, therefore, could operate in the war zones was by chartering vessels carrying a foreign flag, which it was then decided to do and which it did. Its own vessels were operated in other areas, which included the domestic ports of the United States and the probable use of the Panama Canal for that purpose.

By Congressional enactment a domestic railroad corporation was prohibited from having any interest in vessels operated intercoastal through the Panama Canal. To eliminate this situation, and after some negotiations with the Securities Corporation of New York Central, and at a meeting of the board of directors on December 12, 1939, at which were present the three directors elected by the Securities Corporation and the defendants Sudman and Valentine, it was decided to purchase the 6,000 shares of preferred stock which that corporation held. The par value of the 6,000 shares of preferred, plus accrued dividends to January 12, 1940, in all ag-

gregating $603,568.51, was paid to the Securities Company, and on the next day, the directors elected by the Securities Corporation resigned and were replaced by three of the defendants.

On February 24, 1940, the Black Diamond Lines executed a charter party to the Isthmian Steamship Company of all of the eight vessels, which made provisions for release of any vessel that might be sold on the completion of its then current voyage, provided for war risk insurance, if required (and it was required as to some of the vessels), to the extent of $500,-000 for each, to be subject to change in accordance with market value of tonnage, and fixed a charter rate of $3.60 on total dead weight of the vessels (which totalled 65,387 tons), such charter rate to be adjusted from time to time as the market might require.

With the invasion by Germany of Belgium and Holland, the operation by Black Diamond Lines of the foreign flag vessels was necessarily stopped and the last sailing of any such vessel was in April or May 1940. From then on the work of the 65 or 70 employees of Black Diamond Lines, including the plaintiffs, was necessarily reduced to a minimum, and it was suggested that they start to look for other positions. There was inaugurated the practice of giving many of the employees vacations with pay, with two weeks on and two weeks off. The uncertainty of the war, the events at Dunkerque and the fall of France made it seem probable that the war would soon terminate. Later with the survival of Britain, the end seemed postponed to the distant future.

In July, 1940, President Roosevelt advocated the passage of an excess profits tax, and hearings were commenced before Congressional committees looking to that end. The possibility that such tax might be based upon the invested capital of the corporation or its profits for the three years 1936, 1937 and 1938, was discussed in Congress as well as in the newspapers. The invested capital of Black Diamond Lines was small and it had not been operating in 1936 and 1937, so that it seemed probable to the executives that any excess profits tax would wipe out a large portion of any profits which the company might receive, and at that time those profits were large, as well as require them to pay an individual tax on any distribution. Consideration was given by the executives in conference with their attorneys to ways and means which might be adopted under the circumstances. Those ways and means included the discharge of the employees or as many as could be eliminated, the dissolution of the corporation, and the formation of a partnership. The culmination of these conferences was the decision that all of the employees but four be discharged, and on September 20, 1940 all of them, including the two plaintiffs, were discharged. The employee stockholders were asked at that time to bring with them their stock certificates on the following Monday, September 23, 1940, and I have no doubt were told that the executives intended to exercise the option which had previously been given. The two plaintiffs and the other employee stockholders did as requested, and at a meeting in Weehawken, they were addressed by the defendant Sudman, endorsed their certificates of stock, delivered them to the defendant Valentine, and each was paid $4.38 a share, which was shown to be the book value as of June 30, 1940, by a report of outside accountants produced at the meeting.

On September 27, 1940, a partnership was formed by the executives, a cash liquidating dividend in the sum of $400,000 was declared and paid, and the eight vessels and the major portion of the other assets of the corporation aggregating about $70,000 were transferred to the individual partners as of September 30, 1940.

The employees were paid up to and including September 20, 1940, and all of those who were not subsequently re-employed were given six months dismissal pay. Mr. Deuber was one of those. Mr. Lawrence was never re-employed by the partnership. On the 23d, 24th or 25th of September 1940, he was asked whether he cared to continue in the service of the Black Diamond Lines in liquidation, in the same position that he had previously held, and upon his acquiescence he was so employed. He was paid for his work from September 23 to September 30, by

check, which covered those particular dates, inclusive, but was not paid for September 21 and 22, as he otherwise would have been had his employment been continuous during the entire month of September. He remained in the employ of Black Diamond Lines in liquidation until June 30, 1942 when his employment was finally terminated and when he received his six months dismissal pay.

For many years prior to September 20, 1940 and thereafter until June 30, 1942, he was the auditor of the corporation, and it was his duty as such to supervise all entries in the books of the corporation, to which he had access at all times, and many of the entries were authorized and approved over his signature. I have no doubt that he knew at all times all of the transactions which were entered upon the books of the corporation.

▋ No attack is made by plaintiffs, either by pleading or proof, upon the validity of their options or of any of the other agreements signed by each of them before September 20, 1940. All were executed under circumstances which are not disputed. They were not the product of any fiduciary dealing, nor of any transaction in which any fiduciary relationship entered or existed. Carpenter v. Danforth, 52 Barb., N.Y., 581–584; Fischer v. Guaranty Trust Co., 259 App.Div. 176–182, 18 N.Y.S. 2d 328, aff'd without opinion 285 N.Y. 679, 34 N.E.2d 379; Levy v. American Beverage Corp., 265 App.Div. 208–216, 38 N.Y. S.2d 517; Chenery Corp. v. Securities & Exchange Commission, 75 U.S.App.D.C. 374, 128 F.2d 303–307, remanded 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626.

At the time the options were signed, so far as plaintiffs were concerned, there was no established relation of stockholder. The certificates may have been issued, but upon conditions subsequently reduced to writing in the options. It is difficult, therefore, to see how much of the argument against the right of majority stockholders to buy stock or to exercise any rights with reference thereto, has any foundation. Under such circumstances, can it be said that the relation of stockholder, if a fiduciary one, which was created by the option or in consideration of it, destroyed or affected the right to exercise the option simultaneously given? Did the new relation nullify the right to exercise the option, to discharge at will, or to do any other act mentioned therein? These questions seem all the more definitely answered when it is remembered that the stock, the subject of the option, was encumbered by an endorsement thereon, that it was subject to the terms of the options and could not be sold, transferred or pledged other than in conformity with their provisions.

At the time of their execution, there was no thought of the sale of ships, or of war, of dissolution, of termination of employment, or of any disposition of assets other than specifically written in the agreements. The executives were not purchasing, or obtaining the right to purchase, stock for any ulterior purpose, to obtain control of the corporation, or for any purpose other than to keep the stock among those active in the business. That thought clearly was predominant in all of the writings even among the executives themselves.

There was no obligation or duty upon the defendants or any of them to sell or give stock to either of the plaintiffs, or to permit either of them to subscribe thereto. It is obvious that the offer was not made to obtain needed capital for the business. So too, there is absent any evidence that the defendants were obtaining the right to buy because of any anticipated profit to themselves or of any anticipated disposition or manipulation of the company's affairs, other than to preclude the possibilities of others not active in the corporation from securing an interest therein. The conditions existing at the time the options were executed continued for many years thereafter until the war, and the events growing out of it, required some action. One might fairly ask, therefore, can it be said that fortuitous circumstances or events not contemplated when the options were given can abrogate continuing rights where there is ability to perform, and the basis of the performance is clearly stated. The options, in my judgment, stand unchallenged and must be accepted as they are written unless for some reason now to be discussed there is to be read into them

conditions clearly not otherwise expressed. The cases involving purchases by majority stockholders of stock from minority stockholders are not in my opinion, parallel or controlling.

Two other questions remain—(1) was there on September 20, 1940, a legal termination of plaintiff's employment "in any manner or for any reason whatsoever"; and (2) were plaintiffs paid for their stock the amount to which they were legally entitled?

■ There is no ambiguity or restriction in the wording of the agreements. They contemplated the right to exercise the option upon the termination of the seller's employment "in any manner or for any reason whatsoever". These words do not preclude the right to buy even with a profit motive, or with any motive. They do not limit the right of the corporation, or of the defendants acting for it, to terminate the employment in any manner or for any reason. There was not written in them that such termination must be for cause. Nor could it be implied. Neither of the plaintiffs had any tenure of office. They, like all other employees, as well as the executives were dischargeable at will and without cause. Watson v. Gugino, 204 N.Y. 535, 98 N.E. 18, 39 L.R.A.,N.S., 1090, Ann.Cas.1913D, 215. Their right to hold their stock was as insecure as their employment. Both were subject to termination without reason, and without limitation.

Plaintiffs would seem to argue that the defendants, although they had the right to buy under certain contingencies, could not, because they were majority stockholders, create the contingency. But they were majority stockholders when the option was made and by it they were given the right to exercise the option whether the prospects of the company were good or bad, whether they planned to continue the corporate entity or dissolve it. In fact, the option as it is written, gave the defendants the right, acting for the corporation, to discharge plaintiffs solely for the purpose of obtaining their stock. The existence of a fiduciary relationship, if any did exist, did not prevent the discharge of either plaintiff.

■ Some point is made that the defendants had no legal right to dissolve the corporation without making provision for the plaintiff stockholders. That might well be the case were plaintiffs stockholders at the time action was necessary to decide the question of dissolution. The options, however, were not dependent upon the existence or dissolution of the corporation and could not be affected by either. Existent or dissolved, defendant still had the right to purchase upon the termination of plaintiffs' employment "in any manner or for any reason whatsoever". The argument, however, seems of little moment. No formal action had been taken to dissolve on September 20 or September 23, 1940, and no one was called upon to do anything about it at that time. Moreover, assuming that meetings of stockholders were called to decide the question and plaintiffs opposed, or for reasons of profit to themselves were favorably inclined to acquiesce, I still think, under the terms of the option, defendants would have had the right to terminate the employment, to exercise the option, and to pay for the stock what the agreement called for.

And there is not the slightest evidence that either plaintiff objected to the termination of his employment or to the exercise of the option or to the amount of money received by them when the stock was transferred.

Clearly, both were discharged on September 20, 1940. Both admit this, and say that they both expressed shock or surprise at the contents of the notice and the sudden termination of their employment. They were both told to bring in their stock the following Monday so that the option could be exercised. They did so, and made no objection.

Deubler was never thereafter re-employed, and received his pay to that date, as well as his dismissal pay. Lawrence was paid up to September 20 and was later continued in the employ of Black Diamond in liquidation, with the same duties and same pay as before.

There is no question of fraudulent representation as to these facts. They were not told to pay no attention to the notice of dismissal. They were told not to take it too seriously. They were to receive a considerable amount for dismissal pay, and they were assured that the prospects for

employment elsewhere were bright. What was said on September 20 and September 23, 1940, was not to induce the discharge, or the sale of their stock and payment therefor. That had already been provided for by express agreement. Rather what was said was to explain in part the reason for the action taken by the executives. And as to that, there is very little dispute.

Lawrence says that the meeting was told by the defendant Sudman that due to prospective high taxes on the corporation and individuals, it had been decided to reorganize the company, and to do so they had taken that means for acquiring the stock to facilitate putting it through by September 30, 1940; that the employees had nothing to worry about and would be taken care of, would receive six months dismissal pay and would also be paid the book value of the stock. He may have said that the Black Diamond Lines was going to be dissolved, something about the possibility that the ships might be requisitioned by the government, and that he hoped to give all of them their jobs in the future when they would buy new ships and operate a line in the North Atlantic. The pleading is that it was represented that the dissolution was decided upon by the Board for the good of the corporation and defendants were purchasing the stock solely for the purpose of facilitating it, and that the business would be reorganized and the minority stockholders be given an equivalent interest therein. This seems rather inconsistent with the fact that their stock was being purchased and paid for under a contract expressly permitting such action. Plaintiffs' witness Ness states that they were told the executives were going to make a partnership out of it, and it would be too cumbersome with so many people, and they were getting the employees out as stockholders because it would not be a stock corporation, and that it would affect some of them more than others.

Deuber testified that he was told the meeting had been called because, due to very excessive taxes, Mr. Sudman was concerned with the situation that called upon him to dissolve the corporation and reorganize it in some other form under a different type, such as a partnership, and

he had used this means of giving them their discharge papers; that they would be paid $4.38 for the shares and for the time being he would also pay them dismissal pay of six months and that they had nothing to worry about, that they would be taken care of.

The defendant's version of what was said by the defendant Sudman at the same meeting is not very dissimilar. He testified that he called the attention of the plaintiffs and the other employee stockholders to the fact that they had been sitting around for a number of months doing nothing; that they could not expect to be kept on the payroll indefinitely; that there were plenty of jobs around in the steamship offices which it would be to their advantage to get; that the company was going to be dissolved because heavy taxes were expected, which would mean double taxation for the corporation and stockholders; that defendants were going to exercise the option and the employees were to receive checks for the book value of the stock; that a financial statement was there, approved by the accountants, and which they could examine; that if any of them got into trouble or difficulty, they need not hesitate to come to see him. And he further stated that he told the meeting that they expected to form a partnership, that the five executives were to be partners, that some of the employees would get jobs, and others would have to get out and hustle; that they hoped at some time to be back in the Antwerp-Rotterdam trade, and that they would be with them again.

The defendant Valentine's testimony was much to the same effect. He testified that Mr. Sudman said, in substance, that the employees had received their discharges, and he was sorry that they had to be handled in such a formal way; that they knew the regular business to Antwerp and Rotterdam had stopped on account of the war, and that many of them since then had had nothing to do; that they had probably read during the summer about the new excess profits tax and that such a tax would be very serious to a corporation with as small a capitalization as Black Diamond's; that by the time they paid

normal taxes on the company's earnings and the excess profits tax proposed, and then personal taxes on whatever income was left, there would not be much left of the earnings; for that reason they had decided to liquidate and dissolve the corporation, and the five executives planned to form a partnership and carry on whatever business they could find; that some of the men would be employed by that partnership and others would not have any difficulty in finding employment in the shipping business. He further said that no one could forecast how long the war would last and when it was over, they expected to get back into the Antwerp-Rotterdam trade, and at that time they hoped the employees would be back with them again. He further said that they had been requested to bring their stock, that they were going to exercise the option and in accordance with its terms, the employees would be paid book value; that a financial statement of the corporation for the period ending June 30, 1940 was there, which showed the book value as of that date to be $4.38 a share; and if any of them had any question to ask in connection with the statement or in any other connection, he would be very glad to answer them. He also told them that they had planned to give all employees dismissal pay; that the department heads would receive six months salary and the other employees three months.

The net result of it all is that defendants did no more than what the contracts with the plaintiffs authorized them to do. No matter what they said plaintiffs' employment could be terminated for any reason whatsoever, and the stock purchased. It is difficult to see how fraud can be founded upon the exercise of contractual rights in accordance with the terms of the contract.

The remaining question is whether plaintiffs were paid for their stock the amount to which they were legally entitled. Here again the contract is unambiguous—"The purchase price to be paid * * * shall be the book value or net equity of the shares as shown on the regular audited balance sheet of the corporation for the quarterly period just preceding the quarterly period in which the purchasers give notice of their election to purchase said shares of stock under said option".

The certificates of stock issued to plaintiffs were endorsed subject to the terms of the option, and could not be pledged, sold or otherwise transferred other than subject to its terms. It is to be noted that the price to be paid was not stated to be the "actual book value" or the "market value", or even the "book value". It was the book value shown on the audit balance sheet of the preceding quarter. The many cases cited upon this subject cannot be said to be decisive, therefore, unless the wording of the particular agreements there in consideration was like that found here. Lane v. Barnard, 185 App.Div. 754, 173 N.Y.S. 714; Kaufmann v. Kaufmann, 222 Pa. 58, 70 A. 956.

This court is not asked, nor authorized, to reform the contracts between the parties to insert in place of what is found therein the words "market value", "actual value" or "actual book value" and to strike out the reference to the quarterly audit balance sheet.

What, then, was the book value on September 23, 1940? There is no evidence that there was any manipulation or fraudulent recording thereof in the books. The only question in my mind is whether some additional amount should have been added to surplus which would have increased the book value of the shares.

This contention rests largely upon the fact that after Black Diamond was dissolved as of September 30, 1940, the company's accountant, who had prepared the statement of June 30, 1940, upon which the price paid to plaintiffs for the stock had been based, on February 12, 1941, prepared a financial statement, and in one of its schedules, relating to the adjustment of the surplus account, there was added to surplus $311,451.39, as an adjustment for reserve for depreciation on vessels. If account had been taken of this at the time plaintiffs' stock was purchased, the book value of each share would have been increased by $3.11. (This may not be entirely accurate because there was charged

off something like $16,000 in each of the three months after June 30, 1940, and some adjustment would have to be made in the figure so as to reflect accurately the situation on June 30.)

Of course, it is obvious that if this stock is to be valued from a statement prepared in 1941 as of September 30, 1940, the clause in the option agreements, that the stock shall be valued as at the end of the quarter preceding the time when notice of exercise is given, must be disregarded.

The facts upon this portion of the case are not in dispute. The inquiry revolves almost entirely about the manner and amount by which the cost of the eight vessels was from time to time depreciated. It cannot be determined by market values or earnings subsequent to the times fixed in the options at which book values are to be ascertained. Prospective values or changes in earnings are not to be the yardstick. O'Brien v. O'Brien, 294 Ky. 793, 172 S.W.2d 595.

As has been shown, the Black Diamond Lines was the successor in interest and title to the eight ships originally purchased by the American Diamond Lines in 1931. The cost of those ships less the depreciation then accrued was then entered upon the books of American Diamond in vessels' account. The ships were then approximately 12 years old. A prospective life of 20 years is generally used in the shipping business as a proper accounting basis, and seems to be recognized by various Congressional enactments. Certainly, to the knowledge of Lawrence, it was the standard recognized and used by American Diamond and Black Diamond during all of the period in question, at least until December 13, 1938. Having at the date of purchase eight more years of life, depreciation was charged off and added to depreciation reserve at the rate of 12½% of the cost per year from and after the date of the purchase of the ships. In 1935 fault was found with this practice by the Bureau of Internal Revenue, which claimed that for income tax purposes the period was too short. After some negotiations, a life of 22½ years, after deducting a residual value of 10%, was agreed upon between American Diamond and the Tax Department for income tax purposes. The

board of directors of American Diamond, composed of two representatives elected by the New York Central Securities Corporation and one by Iselin & Company, the fourth being the defendant Sudman, decided, however, on June 18, 1935, that the practice of setting aside a reserve for depreciation on the same basis as theretofore would be continued on the books of the corporation. And that was done throughout the time that American Diamond owned the ships and the same practice was continued from the beginning of the Black Diamond Lines until December 13, 1938.

On that date, the board of directors of Black Diamond, then consisting of three directors, elected by the Securities Corporation, and Messrs. Sudman and Huck, again considered the question of changing the basis for accumulating on the company's books a reserve to cover depreciation of the vessels. A resolution was adopted which recited that the company had set aside depreciation in excess of the rate at which the vessels had actually depreciated, so that the value of the vessels on the books was shown to be only $501,919.05 as of September 30, 1938, as compared with $874,-943.84, shown on the company's income tax return as the value on that date as determined by the Commissioner of Internal Revenue. It also recited that the Commissioner provided for a residual value of $104,528.40 for the eight vessels as of August 31, 1943, after all depreciation allowable for income tax purposes had been accumulated against the cost of the vessels and additions thereto. The resolution further stated that it was deemed desirable to revise the then basis to a rate that would result in the vessels being written down to the residual value provided for by the Commissioner by September 30, 1940, and that the officers of the company be authorized and directed to discontinue the then basis, and in lieu thereof, to set aside a reserve at the rate of $200,000 per annum beginning October 1, 1938, until the vessels were written down to the residual value of $104,528.40. Prior to that time the amount carried to reserve for depreciation had been approximately $286,000 a year.

Beginning as of October 1, 1938, therefore, depreciation was charged off at the

new rate, to the knowledge of the plaintiff Lawrence, and on June 30, 1940, the date when the plaintiffs' stock was valued for the purposes of the exercise of the option, the vessels had been written down to $154,202.31.

No claim is made that, if that is the proper figure at which the ships should be carried on the books of the corporation, the book value of stock was not $4.38 per share. It is shown, however, that after the option was exercised and the plaintiffs paid, a cash dividend of $400,000 was paid to the executives, who were then the sole stockholders, that the eight ships were conveyed to them along with other assets, and that the financial statement as of September 30, 1940, previously referred to and dated February 12, 1941, was subsequently prepared by the outside accountants, who had prepared the statement of June 30, 1940, by which there was added to surplus $311,451.39 as an adjustment of reserve for depreciation on the vessels.

Clearly, the reconciliation of surplus and vessel account was solely a product of the accountant's desire to reconcile the statement as of September 30, 1940, when it is contended Black Diamond was liquidated, with the income tax statement to the Internal Revenue Department, which was to be made and was made as of that date. It is also clear that had the old plan of charging off depreciation on the basis of a 20 year life been continued instead of changed in 1938, the entire cost of the ships including the residual value of $104,528.30, would have been written off before June 30, 1940 and the book value of stock would have been less than as it was shown on the books at that date.

Certainly, the bookkeeping practice and the ascertainment of book values quarterly was consistently followed throughout all of the years until June 30, 1940. And the change in the rate of reserve for depreciation was adopted at a time when the defendants were not the sole directors of the corporation, and before there was any prospect of disagreement with the employee stockholders, or any possible intent on the part of the defendants to acquire their stock, or do any of the other acts which followed September 23, 1940. That practice was also indulged in before there was any question or contemplation of a sale of the ships and while the affairs of the corporation were proceeding on the even tenor of their way.

It is shown, and it is not contended otherwise, that good bookkeeping practice would not tolerate a writing up or down of the value of the vessels depending upon a fluctuating market or because of changes in economic or international conditions. There must be some stability in accounts of corporations for financial, income tax, and other obvious reasons. And in the last analysis, the only real reason asserted by plaintiffs is that when they were finally called upon to transfer their stock, the books did not show what they were entitled to receive because there had not been added the amount already specified, being the difference between what had been charged off for depreciation and the amount which the Internal Revenue Department thought should have been. That the change had not been previously made was because the action of the board of directors, which was then controlled by other than defendants, had directed that it should not be made. No change had been made in the agreements. Kaufmann v. Kaufmann, 222 Pa. 58, 70 A. 956, supra.

The contention of the plaintiffs in their pleadings that the defendants contemplated the sales of these ships before the exercise of the options has not been proven, and both of them admitted that they had never had any evidence of that fact before September 23, 1940. The evidence shows directly to the contrary; and that it was not until October 1940, when it seemed obvious that the ships might be requisitioned by the government, was any serious consideration given to a sale of the vessels.

There is another fact which assists me in the determination of this case, and that is, that the plaintiff Lawrence continued in the service of Black Diamond Lines in liquidation from September 23, 1940 until June 30, 1942, without in any way complaining or raising any objection to what had transpired prior to or on the first mentioned date. During all that period of time, and for many years before, he knew intimately what the books showed, what had been

done in the charging off of depreciation on the vessels and the change in the rate, what dividends had been declared, what the ships had been sold for, what they were earning and doing, and where they were being used, and never at any time sought further compensation or made any complaint in any way against the action of the defendants or any of them. All during the time after his discharge on September 20, 1940, he admits that he was making notes of the various bookkeeping items, the sales prices of the vessels and of other transactions which were transpiring after the date the options were exercised. He did not see fit to make any objection or complaint until the beginning of this action on January 18, 1944. It is difficult to believe, under those circumstances, that he believed that he had any adequate grounds for complaint, and he certainly did not exercise due diligence in any claim for a rescission.

The plaintiff Deuber, of course, ceased his employment completely on September 20, 1940, and was paid his dismissal pay. He did not have the opportunity to know as much as did the plaintiff Lawrence, but it is clear that during the period of time after his dismissal and until the beginning of the action, he was in conference with Lawrence as to the various facts which Lawrence was from time to time procuring from the books and other papers of the defendants. He wrote the defendant Sudman on July 21, 1942, a letter which certainly does not reveal any discontent or thought of wrongdoing. He said, in substance, that the rumors that the Black Diamond would be getting ships again was good news and that he hoped things would materialize for the defendants very soon, and "when the time comes that you will be lining up the traffic crew, I shall be happy to be with you again if you will have me."

This certainly does not leave one to suppose that there was any serious complaint of fraud or misrepresentation or wrong dealing in his mind for a long period after he had been paid for his stock and received his dismissal pay, amounting to $2,100, and later in February or March 1941 an additional gift of $5,000.

I cannot, and do not, find that there was any fraud or misrepresentation in any of the dealings between the plaintiffs and defendants. Unless this court is to reform the contracts between the parties, to justify which there is no evidence, the amount paid for the stock was the amount called for by their agreement.

The result follows that the complaint of both must be dismissed upon the merits with costs.

Defendants may submit proposed findings within 10 days, serve a copy upon plaintiffs' attorney who may have five days in which to serve objections. The court will make the ultimate findings and conclusions required by rule 52.