Frede BANK, Plaintiff,

v.

Bernard L. FLEISHER et al., Defendants.

Civ. No. 75-0-472.

United States District Court, D. Nebraska.

Sept. 24, 1976.

As Amended Oct. 1, 1976.

Hyman Edelman, Minneapolis, Minn., Jack W. Marer, Omaha, Neb., for plaintiff.

Charles V. Sederstrom, Omaha, Neb., for defendant Fleisher.

John North, James Cavanagh, Omaha, Neb., for defendant Fisher.

Timothy J. McReynolds, Omaha, Neb., for defendant Katz.

Dirk W. deRoos, Omaha, Neb., for defendant Sterling.

DENNEY, District Judge.

This matter comes before the Court upon motion of defendant, Morton L. Fisher, for summary judgment [Filing # 59], subsequent to oral argument before the Court on August 26, 1976.

Plaintiff, Frede Bank, instituted this action on December 1, 1975, on her own behalf for declaratory and injunctive relief against defendants, Bernard L. Fleisher,

Morton L. Fisher, Seymour Katz, and Harry B. Cohen; on her own behalf for damages against defendants Fleisher, Fisher and Katz; derivatively on behalf of defendant, Sterling Distributing Company (hereinafter referred to as Sterling); for money damages against defendants Fleisher, Fisher and Katz; and on behalf of herself and Sterling for an accounting by defendants Fleisher, Fisher and Katz. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1332.

## FINDINGS OF FACT

Extensive discovery has been pursued by the parties and the following material facts are not in dispute. Sterling Distributing Company, a Nebraska corporation, is engaged in the wholesale liquor business. In 1958, the corporation was dissolved at the time of the divorce of plaintiff, Frede Bank, and defendant, Bernard Fleisher, two of its major stockholders. Simultaneously with the corporate dissolution, Sterling was reconstituted as a partnership consisting of Fleisher and Katz.

In 1962, the Fleisher-Katz partnership was dissolved and the current Nebraska corporation was formed, its capital then consisting of $200,000.00 represented by 2,000 shares of stock distributed as follows: 500 shares to Fleisher; 500 shares to Katz; 500 shares to Bank; 300 shares to Fisher, the chief operating officer of the company; and 100 shares each to Penny Pynes and Carol Lincoln, Fleisher's and Bank's children. Contemporaneously with issuance of the stock, Fleisher entered into separate option agreements on May 1, 1962, with each of the other shareholders. Each option agreement provided that Fleisher had the right to purchase the stock from each shareholder, at any time, for an amount determined by a formula set out in the agreements. Each shareholder also signed an election for Sterling to be a "Subchapter S" corporation. In 1970, Fleisher, Katz and Bank entered into a written agreement that none of the parties to the agreement would take any action to terminate the Subchapter S status of Sterling without first obtaining the unanimous consent of all of the shareholders of Sterling.

In April, 1970, Fisher purchased an additional one hundred shares of Sterling stock, subject to his May 1, 1962, option agreement with Fleisher. In 1974, Bank gave fifty of her shares to her son, James Fleisher, who also entered into an option agreement with his father identical to the other option agreements.

From May 1, 1962, until November 19, 1975, Fleisher, Fisher and Katz constituted the entire Sterling Board of Directors. From May 1, 1962, until April 28, 1970, Fleisher was president, Fisher was vice-president and Katz was secretary-treasurer. From April 28, 1970, until November 19, 1975, Fleisher was chairman of the board, Fisher was president, Cohen was vice-president and Katz was secretary-treasurer.

The following events occurring shortly prior to and after November 19, 1975, culminated in this lawsuit. Fleisher, apparently experiencing financial difficulties, began to borrow money from Sterling sometime after May 1, 1971. In April of each year, Fleisher would arrange to repay his debt prior to the end of Sterling's fiscal year on April 30, thereby preventing indebtedness from appearing on Sterling's financial statements. These repayments consisted of the application of Fleisher's Subchapter S dividends to the debt together with funds borrowed from Fisher, Katz, lending institutions and private parties not affiliated with Sterling. These borrowing activities finally resulted in an indebtedness which Fleisher was unable to repay. At the end of August, 1975, Fleisher owed Sterling on unpaid loans $532,533.42 and at the end of September, it was reduced to $492,533.42, which is the present unpaid balance.

On October 10, 1975, a meeting took place at the request of Fleisher between Fleisher, Bank, Bank's husband, Fleisher's attorney, and Bank's business advisor. Fleisher disclosed at the meeting that he had borrowed in excess of $500,000.00 from Sterling and that he was unable to repay his indebtedness. From October 10 forward, a variety of negotiations took place in an attempt to

resolve the problem and protect the interest of Bank and her children in Sterling, but negotiations apparently broke down on or about November 14, 1975.

A few days later, on November 19, 1975, Fisher and Fleisher executed a written agreement which represented their bilateral determination of a solution. The agreement provided that Fisher was to provide Fleisher with sufficient funds to exercise Fleisher's options to purchase the stock. Fisher was to deliver the funds for exercise of the options by Fleisher directly to Cohen, the trustee named in the various option agreements. Fleisher was then to exercise the options and acquire all Sterling stock other than his and Fisher's. Immediately upon acquisition of this stock, Fleisher was obligated to transfer it to Fisher. Upon this transfer, Fisher would be the majority shareholder of Sterling, holding 1,600 shares to Fleisher's 500. The cost to Fisher was to be $369,576.00.

After the foregoing events took place, the agreement called for Fisher and Fleisher to immediately vote their stock in such a manner as to effect a redemption of Fleisher's Sterling stock. Under this provision of the agreement, Sterling would redeem Fleisher's shares for $500,000.00 by giving Fleisher ten $50,000.00 promissory notes. These notes were due at the rate of one per year on January 2 of each year commencing January, 1976. At the same time, Fleisher would satisfy his $492,000.00 debt to Sterling by giving Sterling ten $50,000.00 promissory notes; these notes were also due at the rate of one per year on January 2 of each year commencing January 2, 1976. In the event that Fleisher failed to pay his notes as they became due, the agreement provided that Sterling would be entitled to offset its obligation to Fleisher against Fleisher's obligation to Sterling. In this manner, Fleisher's debt to Sterling was to be canceled and Fisher was to become sole shareholder of Sterling. Yet no cash was to change hands. Obviously at each of the ten

following January 2 dates beginning with January 2, 1976, the Sterling $50,000.00 note for Fleisher's stock would be offset and canceled off against the Fleisher $50,000.00 note for his debt.

The Fisher-Fleisher agreement also provided that Sterling would pay Fleisher $25,000.00 annually for five years in return for Fleisher's covenant not to compete against Sterling during that period of time. They also agreed that once Fisher became sole shareholder of Sterling, he would vote his stock to terminate Sterling's Subchapter S status. Finally, Fisher agreed to pay legal and accounting fees incurred by Fleisher and to pay for any legal action necessary to implement Fleisher's exercise of the option.

On the same date the agreement was executed, it was immediately implemented. Fisher deposited funds with the trustee sufficient to cover Fleisher's exercise of the options and Fleisher sent letters to the interested parties, informing them that he was exercising his option. In each case, the option price was calculated in accordance with the terms of the option agreements.[1]

On November 25, 1975, after consultation with counsel, Bank, on behalf of herself and her children, notified Fleisher that his exercise of the option was void and illegal and was, therefore, rejected. Trustee Cohen was also advised of Bank's position and Bank demanded that Cohen take no steps to implement the option. On the following day, November 26, Fleisher commenced an action in the United States District Court for the District of Nebraska to enforce the exercise of the option against Bank. On December 1, 1975, Bank instituted this lawsuit.

Katz sold his stock to Fleisher pursuant to the exercise of the option and then resigned from the offices of secretary, treasurer and director. Fisher was then elected president and secretary and his son-in-law was elected vice-president and treasurer.

---

1. Neb.Rev.Stat. § 21–2045 (1974) prohibits a corporation from making loans to its officers and directors. Plaintiff's contention that since the computation of the option price did not reflect amounts due Sterling for interest on his loans, the amount tendered is inadequate, is not presented in Fleisher's motion for summary judgment.

Of the 500 shares received from Katz, Fisher was transferred 450 shares, his wife received 10 shares, and four other persons each received 10 shares.

Plaintiff's complaint alleges five counts as follows: Count I is based upon Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5; Count II, as amended, is based upon violation of Nebraska Business Corporation Act, Neb.Rev.Stat. 21–2045 and 21–2046 (1974) by reason of the loans to Fleisher and common law fraud; Count III requests an accounting by Fleisher, Fisher and Katz for funds extracted from Sterling; Count IV is a derivative action by Bank on behalf of Sterling, seeking a judgment that Fleisher, Fisher and Katz are jointly liable to Sterling for the amount of the advances made to Fleisher; and Count V alleges that the elimination of the Subchapter S status was a breach of fiduciary duties as well as federal securities law and prays for damages.[2]

Defendant, Morton L. Fisher's, motion for summary judgment is directed at Count I of plaintiff's complaint. The gravamen of Count I alleges that Fisher, Fleisher and Katz illegally incurred an indebtedness to Sterling which was immediately payable by them to the corporation. However, Fleisher was unable to immediately repay the debt and Fisher and Katz were either unable or unwilling to repay it. Fisher, desiring to effectuate control of the corporation, thereupon devised a scheme to obtain control. That plan culminated in the Fisher-Fleisher Agreement of November 19, 1975. The complaint alleges that Fleisher instituted a program looking to the possible discharge of his loan obligation and in that connection conceived a plan and scheme to use his option to purchase the shares of stockholders other than himself, Fisher and Katz, for his private, preferential benefit and advantage, to the detriment and disadvantage of stockholders other than Fleisher, Fisher and Katz, and used and employed, in connection with the purchase and sale of Sterling capital stock, manipulative and deceptive devices in contravention of Section 10 and Rule 10b–5. The complaint further alleges that since the option to purchase held by Fleisher was a personal right available only to Fleisher, it was illegal, improper, and contrary to the purposes and intent of the Option Agreement to exercise the option for the preferential and unlawful advantage of Fleisher, Fisher and Katz.

## CONCLUSIONS OF LAW

The framework from which a federal court must pass upon a motion for summary judgment is well established.

Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This rule authorizes summary judgment "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . [and where] no genuine issue remains for trial . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, [64 S.Ct. 724, 728, 88 L.Ed. 967] (1944). *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).

In passing upon such a motion, the Court is required to view the facts in the light most favorable to the party opposing the motion and to give to that party the benefit of all reasonable inferences to be drawn from underlying facts. *Adickes v. S.*

---

2. If the transfer of shares from Katz to Fisher and from Fisher to six individuals is valid and the exercise of the option agreement is invalid, Sterling will have eleven shareholders. For Subchapter S purposes, a small business corporation cannot have more than ten shareholders. § 1371(a)(1), Int.Rev.Code. A Subchapter S election terminates automatically when the corporation ceases to be a small business corporation. § 1372(e)(3), Int.Rev.Code.

*H. Kress & Co.,* 398 U.S. 144, 153–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Oskey Gasoline & Oil Co. v. Continental Oil Co.,* 534 F.2d 1281 (8th Cir. 1976); *Hanke v. Global Van Lines, Inc.,* 533 F.2d 396, 397 (8th Cir. 1976).

■ While a party who moves for summary judgment has a heavy burden of persuasion, nevertheless, his motion should be granted if the Court is satisfied to the requisite degree of certainty that the record presents no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. As the Court of Appeals for the Eighth Circuit stated in *Lyons v. Board of Ed. of Charleston, etc.,* 523 F.2d 340, 347 (8th Cir. 1975):

> Thus, although we have repeatedly emphasized that summary judgment is an extreme remedy, not to be employed unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recovery under any discernible circumstances, *Ozark Milling Co. Inc. v. Allied Mills, Inc.,* 480 F.2d 1014 (8th Cir. 1973) and cases therein cited, we recognize as well its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried.

The parties have stipulated that the Option Agreement was a valid agreement. It is also undisputed that $492,533.42 was withdrawn from Sterling by Fleisher and that the withdrawals are unlawful. Nevertheless, defendant argues that because the option agreements were valid, the reason for the exercise of the option is irrelevant, and plaintiff is not entitled to relief under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.   .   .   .   .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5, makes it unlawful for any person, directly or indirectly, by use of any of the jurisdictional means set forth in Section 10(b)

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The sole legal issue presented in this case by defendant's motion is whether there can be a claim of fraud under federal securities laws when a party is legally obligated by contract to sell his securities. Defendant relies on several cases in support of a negative answer.

*Lawrence v. Sudman,* 70 F.Supp. 387 (S.D.N.Y.1945), involved the exercise of an option agreement giving directors an option to purchase stock from employees within six months after termination of employment.

Plaintiffs would seem to argue that the defendants, although they had the right to buy under certain contingencies, could not, because they were majority stock-

holders, create the contingency. But they were majority stockholders when the option was made and by it they were given the right to exercise the option whether the prospects of the company were good or bad, whether they planned to continue the corporate entity or dissolve it. In fact, the option as it is written, gave the defendants the right, acting for the corporation, to discharge plaintiffs solely for the purpose of obtaining their stock. The existence of a fiduciary relationship, if any did exist, did not prevent the discharge of either plaintiff.

. . . . .

The net result of it all is that defendants did no more than what the contracts with the plaintiffs authorized them to do. No matter what they said plaintiffs' employment could be terminated for any reason whatsoever, and the stock purchased. It is difficult to see how fraud can be founded upon the exercise of contractual rights in accordance with the terms of the contract.

*Id.* at 394–396.

Similarly, *Ryan v. J. Walter Thompson Company,* 322 F.Supp. 307 (S.D.N.Y.), affirmed, 453 F.2d 444 (2nd Cir.), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1971), involved the option of a corporation to purchase stock of its employee in third year after retirement. The Court concluded:

Ryan was therefore obligated to sell his shares to Thompson in January, 1969. Whatever he knew or did not know made no difference in what he was required to do. There can be no possible claim under Section 10(b) and Rule 10b–5 in such circumstances. *Id.* at 313.

In *Fershtman v. Schectman,* 450 F.2d 1357 (2nd Cir. 1971), limited partners brought an action under federal securities legislation and S.E.C. rule for concealment or misrepresentation in the termination of a limited partnership. The Court of Appeals for the Second Circuit held:

[I]f defendants were legally entitled to terminate the partnership on March 31, 1968, in their sole discretion, it would

make no difference what they misrepresented or concealed, even if we assume in plaintiff's favor that this transaction constituted a sale. [Citations omitted]. *Id.* at 1360.

Another case in support of defendant's proposition is *Blackett v. Clinton E. Frank, Inc.,* 379 F.Supp. 941 (N.D.Ill.1974), wherein a former employee of a corporation brought an action for alleged violation of securities laws in connection with corporation's purchase of former employee's shares upon termination of his employment. The court reasoned:

Since the plaintiff was obligated by the 1969 Stock Purchase Agreement to sell his shares of CEF at the time of his termination, whatever he knew or did not know regarding CEF's plans to go public, issue a dividend and have a stock split was irrelevant. Clearly the plaintiff has not properly alleged, nor do the relevant pleadings support a conclusion, that the plaintiff was fraudulently induced into selling his shares of CEF by the material misrepresentation made by the defendants. In fact, the plaintiff apparently had no choice in the matter; he was obligated to sell his stock pursuant to the provision of the 1969 Stock Purchase Agreement as soon as his employer CEF had terminated his services. *Id.* at 947.

The Court has carefully read the cases cited by plaintiff and finds them distinguishable. *Marshel v. AFW Fabric Corp.,* 533 F.2d 1277 (2nd Cir. 1976), was an action brought to enjoin a corporate merger. Concord was a private corporation owned by the Weinstein family until 1968, at which time it went public. After the public offering, the Weinsteins owned 68% of Concord's stock and the remaining 32% was publicly held and traded. In January, 1975, the Weinsteins decided that Concord should again become a private corporation. To "go private" the Weinsteins organized AFW and transferred to it all of their Concord stock. The only function of AFW was as a corporate vehicle for the Weinsteins' interest in Concord. Next, AFW made a tender offer for all publicly-held Concord

shares. This purchase was to be financed through bank loans to AFW which would ultimately become obligations of Concord. The tender offer stated that, regardless of whether any shares were tendered, after the offer expired AFW would cause a merger between AFW and Concord. Under the terms of the proposed merger, the Weinsteins would receive all stock of the surviving company while the publicly held stock would be canceled.

Alleging violations of Section 10b and Rule 10b–5, the plaintiffs contended that, unless a legitimate corporate purpose of Concord would be furthered by elimination of the minority shareholders, the proposed merger could not proceed. Conceding that no such corporate purpose was served, defendants argued that such absence was irrelevant because the proposed merger complied in all respects with the New York statutes governing such mergers. The court rejected defendant's contention.

> We hold that when controlling stockholders and directors of a publicly-held corporation cause it to expend corporate funds to force elimination of minority stockholders' equity participation for reasons not benefiting the corporation but rather serving only the interests of the controlling stockholders such conduct will be enjoined pursuant to Section 10(b) and Rule 10b–5 . . . .. 533 F.2d at 1281.

In *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283 (2nd Cir. 1976), minority shareholders brought an action against majority shareholder and firm which appraised value of the stock for purposes of permitting the company to undergo a Delaware short-form merger. The Delaware "short-form merger" statute permits a majority of 90% or more of the shareholders of a Delaware corporation to eliminate all minority shareholders without prior notice of intent to do so, without any justifiable corporate reason for the merger which accomplishes such result, and upon payment to the minority of an amount-per-share determined by the majority. This statute has been characterized as an agreement between a corporation and each of its shareholders "that in the event

of a merger the corporation surviving the merger should have an option to buy" the shareholders' stock at a price to be determined in the future. *Voege v. American Sumatra Tobacco Corporation,* 241 F.Supp. 369, 374 (D.Del.1965). The court rejected defendants' contention that because the merger was valid under state law there could be no securities law violations.

> When controlling shareholders of a publicly held corporation use corporate funds to force extinction of the minority shareholders' interest for the sole purpose of feeding the pocketbooks of the controlling shareholders, such conduct goes beyond mere negligent mismanagement and is properly cognizable as "an act, practice, or course of conduct which operates or would operate as a fraud . . .." The majority has abused its equitable powers by exercising them for the "aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis.*" *Pepper v. Litton,* [308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281, 292 (1939)]. 533 F.2d at 1290.

*See also Shell v. Hensley,* 430 F.2d 819 (5th Cir. 1970); *Drachman v. Harvey,* 453 F.2d 722 (2nd Cir. 1972) (*en banc*); *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 412 F.Supp. 45 (E.D. Mo.1976); and *Bryan v. Brock & Blevins Co.,* 343 F.Supp. 1062 (N.D.Ga.1972).

The distinctions are readily apparent. All cases cited by plaintiff involve corporations in which majority shareholders were attempting to use corporate funds to distinguish the interests of minority shareholders. All involved mergers or sham transactions which would trigger the sale of the stock. Minority stockholders clearly have an expectation that mergers will be consummated only for a valid corporate purpose. In the instant case, there is no act analogous to a merger which triggered the exercise of the option. Indeed, no act was required to condition the option exercise, but it could be exercised at the whim or caprice of Fleisher.

The fundamental purpose of federal security legislation was to substitute a

philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry. *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Section 10(b) prohibits the use of fraud or scheme to defraud in connection with the purchase or sale of securities. It does not prohibit the sale of securities to effectuate a scheme to defraud if the exercise of the option was innocuous, though constituting overt acts furthering the allegedly fraudulent scheme.

The Court concludes that a valid exercise by Fleisher of the options cannot predicate liability under Section 10(b) and Rule 10b–5. Nevertheless, the Court is unable to say that plaintiff is not entitled to recover pursuant to Section 10(b) and Rule 10b–5 under any discernible circumstances. Plaintiff alleges in her complaint as follows:

> Wholly apart from the impropriety and illegality of Fleisher's purported exercise of option to purchase plaintiff's Sterling stock, the price specified in said notice fails to reflect the correct book value of Sterling assets in that Fleisher, Fisher and Katz permitted the aforesaid loans and advances to be made to Fleisher without payment of interest and without recording such interest obligation on the Sterling books and without reflecting other transactions whereby Fleisher and Fisher abstracted and withdrew other funds from Sterling which adversely affected and reduced the book value of Sterling's stock. The exact amount of such understatement of book value can be determined only by a proper accounting and discovery which plaintiff seeks in this action. ¶ 15(i).

Whether the book value of Sterling was understated appears to be a material fact in dispute. Furthermore, plaintiff alleges that the exercise of the option personal to Fleisher for the benefit of Fisher was in contravention to the option agreement.

**3.** Rule 56(d) provides that the Court shall find the facts in cases not fully adjudicated on motions for summary judgment and upon trial of

(Plaintiff's complaint ¶ 15(e)). Defendant, Fleisher, has not established his right to judgment under Count I and summary judgment is not proper.

In accordance with Rules 52 and 56(d), Fed.R.Civ.P.,[3] the foregoing shall consist of findings of facts and conclusions of law and trial shall be conducted accordingly. Defendant's motion for summary judgment shall be denied, without prejudice to its reassertion upon a developed factual record and brief.

IT IS SO ORDERED.

the action the facts so specified shall be deemed established.