## McKENZIE–HAGUE CO. v. CARBIDE & CARBON CHEMICALS CORPORA-TION.

### No. 9927.

Circuit Court of Appeals, Eighth Circuit.

Oct. 3, 1934.

Gordon Cain and H. W. Volk, both of Minneapolis, Minn. (Drew & Cain, of Minneapolis, Minn., on the brief), for appellant.

Claude G. Krause, of Minneapolis, Minn. (Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., on the brief), for appellee.

Before BOOTH, Circuit Judge, and MUNGER and BELL, District Judges.

BOOTH, Circuit Judge.

This is an appeal from a judgment on the pleadings in an action for damages brought by the McKenzie-Hague Company against appellee.

For convenience, the parties will be referred to as plaintiff and defendant, as in the court below.

The action may be classified as an action for deceit. It arises out of certain contracts under which plaintiff performed work

for defendant in the way of dredging and filling in the Kanawha river at Blaine Island, in the state of West Virginia.

The main question to be determined on this appeal is whether, upon the facts well pleaded in the complaint, together with the facts alleged in the answer and not denied in the reply, the court erred in rendering judgment for defendant.

The salient facts disclosed by the complaint are that in May, 1929, defendant invited bids for the work, and that plaintiff made a bid which was accepted. A formal contract was entered into by the parties dated September 23, 1929. This is known as the "Original Contract," Exhibit A. The complaint alleges that false representations in several particulars were made by defendant, for the purpose of inducing plaintiff to bid on said work and enter into said contract; that defendant falsely, fraudulently, and negligently stated and represented to the plaintiff that the material to be dredged from said river consisted of approximately 10 per cent. gravel and the balance sand; that there existed in said river, within certain indicated limits adjacent to said island, a sufficient quantity, to wit, at least two million cubic yards, of such material; that defendant was then engaged in constructing an embankment on said island with material taken from said river; that the material in said river which was to be dredged and used as fill by plaintiff was of the same kind and character as the material then being dredged and used for said embankment; that defendant had previously had made a hydrographic survey of said river adjacent to Blaine Island and had ascertained the character, location, and amount of such material; that defendant furnished to plaintiff a print or map purporting to show the results of said survey, whereon certain areas of the river bottom were inclosed or encircled with orange crayon lines and other sections were marked off with red crayon lines, and certain figures appeared within the said sections; that defendant further falsely, fraudulently, and negligently stated and represented to plaintiff that within areas or sections marked off with red, there existed the number of cubic yards of the specified material to be dredged (10 per cent. gravel and the balance sand) which were indicated by the figures, all of which would be available to plaintiff for fill, except as hereinafter stated; that defendant further represented and stated to the plaintiff that the Ohio Dredging Company (hereinafter designated "Ohio Company") was then em-

ployed by the defendant in dredging the specified material from said river for dikes and embankments on said island; that the material in areas encircled or inclosed by orange crayon lines was reserved to the Ohio Company; that defendant further falsely and fraudulently stated and represented that in the event plaintiff undertook said proposed work, defendant would reserve for plaintiff all materials in said river within the indicated limits, except the 500,000 cubic yards to be removed by said Ohio Company, and that the defendant would restrict the operations of the Ohio Company to the removal of material from the areas so indicated by the orange lines and would not permit said Ohio Company to dredge or remove material from other areas of said river within indicated limits, but that the same would be reserved to plaintiff.

The complaint further alleges that the representations were made for the purpose of having plaintiff rely on them and that plaintiff did rely on them in making the original contract.

The complaint further alleges that shortly after the making of the contract, plaintiff discovered that the Ohio Company had dredged outside the areas allotted to it and complained of this to defendant; that thereupon a modification of the original contract was made on October 23, 1929, which, among other things, increased somewhat the compensation to be paid plaintiff.

The complaint further alleges that plaintiff proceeded with the work but soon found that the Ohio Company had removed most of the sand and gravel from certain sections allotted to plaintiff, especially sections 6 and 7, and that only coarse gravel and large rocks remained; that plaintiff complained to defendant of this state of affairs and of the financial straits in which plaintiff found itself, and stated that it would be unable to go on with the work unless defendant would loan it the sum of $20,000, and increase the compensation to be paid plaintiff; that defendant renewed its representations as to the quantity and quality of the material in sections other than 6 and 7; that thereupon another contract was entered into between the parties on April 1, 1930, which is known as "Supplemental Contract," Exhibit B. This contract reduced the amount of fill to be made by plaintiff, raised somewhat the price to be paid for the filling, extended the time for completing the work, and provided for a loan of $20,000 from defendant to plaintiff.

The work proceeded. Further complaints were made by plaintiff to defendant relative to the character and amount of the material, and to the representations made by defendant in reference thereto, both those prior to the making of the original contract, as well as those prior to the making of the Supplemental Contract.

Plaintiff contended that all the available material had been removed from the bottom of the river, yet the filling had not been completed.

Finally, on January 23, 1931, a new contract known as "Second Supplemental Contract," Exhibit C, was entered into by the parties. This contract provided, among other things, for the purchase of new land (known as "Joplin Branch Bottom Area") for the purpose of supplying further material; the purchase price to be shared by plaintiff and defendant. By this contract, the areas to be filled were further modified.

These provisions were carried out and the work proceeded until some time in May, 1931.

The complaint alleges that the terms of this Second Supplemental Contract were not carried out by defendant in respect to the slope to be allowed in the dredging operations and in respect to the areas in the Joplin Branch Bottom from which material might be dredged.

In May, 1931, there was an exchange of telegrams and the passing of a letter between plaintiff and defendant. In accordance with these communications, the areas to be filled were still further curtailed; about $1,000 of the loan was to be canceled by defendant; and the remaining work was to be completed, if possible, by June 1, 1931.

In July, 1931, defendant made out and sent to plaintiff a statement of account of the total work showing a balance due plaintiff of about $4,709. A deduction was made of about $766 on account of interest on the loan, leaving a balance of about $3,945. A check for this last amount was sent to plaintiff; also the promissory note and a release of the chattel mortgage which had been given in connection with the loan. On the check was a voucher notation reading as follows:

"For

In full payment of balance due on contract dated September 23rd, 1929, between McKenzie Hague Company, Inc., and Carbide and Carbon Chemicals Corporation, as modified on April 1st, 1930, and January 23, 1931, and satisfaction by, and discharge of, Carbide and Carbon Chemicals Corporation of and from all claims and demands, if any, which McKenzie Hague Company, Inc., may have under or by reason of said contract or work done thereunder or anything connected therewith                    $4,709.66

Less interest at 6% per annum on diminishing balance of $20,-000 loan to June 9, 1931,          766.15

                                   _____
                                   $3,945.53"

On account of this release clause, plaintiff refused the check and tendered it back to defendant, but it was not accepted by defendant, and plaintiff still has it in its possession. Plaintiff alleges in its complaint that it was understood and agreed between the parties in a telephone conversation had about the time of the exchange of telegrams that the proposed settlement did not cover any claims which plaintiff might have against defendant by reason of false representations made to it, or by reason of any breaches of the contract, Exhibit C, by defendant.

We lay to one side discussion of the question of the scope and validity of the release clause contained in the check used in the attempted settlement between the parties in July, 1931.

It may be conceded, without being decided, that the allegations of the pleadings make an issue for a jury in respect to the release clause in question.

We also pretermit discussion of the alleged breaches by defendant of the Second Supplemental Contract, Exhibit C.

The present suit is not brought for a recovery of damages for breach of the Second Supplemental Contract. This conclusion is asserted by plaintiff itself in its brief which states: "All attempts to settle the controversy having failed, appellant brought what is called the 'first action' to recover the damages which it sustained by reason of appellee's breaches of Exhibit C. This action has never been tried. Subsequently, it instituted the present action to recover damages which it sustained by reason of the false representations made to it."

We turn to a consideration of the effect of the false representations alleged to have been made by defendant as an inducement to the making of the original contract, and also of those alleged to have been made as an

inducement to the making of the First Supplemental Contract (Exhibit B).

No false or fraudulent representations are alleged to have been made by defendant as an inducement to the making of the Second Supplemental Contract (Exhibit C).

The contract, Exhibit B, contains a release clause reading as follows: "Releases. Each of the parties hereto hereby releases the other party of and from all claims and demands which either party may have against the other from the date of the original Agreement up to the date of this Instrument [April 1, 1930], except for payments which may be due to the Contractor for work performed by it or for the percentage retained to the date hereof by the Owner, and that said releases shall include all claims which either party may have had against the other because of any change or changes in the said agreement, or because of statements made regarding the fill or the amount, character or location of the same, and the expense of dredging and delivering the said fill."

The contract, Exhibit C, contains a release clause reading as follows: "Releases. Each of the parties hereto hereby releases the other party of and from all claims and demands of any name and nature whatsoever which either party may have against the other from the date of the original agreement up to the date of this Instrument [January 23, 1931], except for the loan heretofore made to the Contractor by the Owner, or for payments which may be due to the Contractor for work performed by it or for the percentage retained to the date hereof by the Owner."

Coercion and duress are alleged by plaintiff in its complaint with reference to the making of the release clause in Exhibit B and also as to the release clause in Exhibit C. The allegations are set out in the margin.*

---

* As to the release clause in Exhibit B:

" * * * that it was a small company and had invested all of its working capital in said machinery and equipment and in fact had been compelled to borrow funds from its bank in order to purchase and assemble the required dredge, machinery and equipment; that it had incurred and then owed between Twenty and Twenty-Five Thousand Dollars on said machinery and equipment and for current bills and expenses of operation, and that it had exhausted its line of credit at its bank and had no further money or credit to carry on said dredging operations and would be compelled to discontinue. That the defendant insisted that plaintiff continue said dredging operations and threatened, in case of plaintiff's refusal, to declare a default in the contract and to take over the same and take possession of plaintiff's said dredge and all of plaintiff's equipment, machinery and tools and to complete said work at plaintiff's cost and expense.

"Plaintiff, represented and stated to the defendant * * * that it was financially unable to continue operations unless the latter would loan and advance to it at least the sum of Twenty Thousand Dollars; * * * that defendant, knowing and seeking to take advantage of plaintiff's condition, circumstances, and financial distress, refused to make said loan except upon the following conditions: that plaintiff would secure the repayment of said loan by a chattel mortgage on its dredge and dredging equipment, and that plaintiff would continue the performance of its said contract and dredge the balance of said material at thirty-five (35)

cents per cubic yard. * * * That the defendant, still fully realizing plaintiff's financial distress and knowing that plaintiff could not continue operations without said loan, and knowing that plaintiff could not secure said loan elsewhere, and fully knowing and realizing its right under said contract, Exhibit A, to take over plaintiff's dredge and all equipment and to complete said work at plaintiff's expense, as provided in said contract, and knowing and realizing that if plaintiff abandoned said contract and the same were completed either by the defendant at plaintiff's expense or completed by the surety on plaintiff's bond, that the plaintiff's default would destroy its credit and reputation as a dredging contractor, insisted that plaintiff continue said work and refused to change its terms or conditions and refused to make said loan unless plaintiff would agree to dredge said materials at thirty-five (35) cents per yard.

"That by reason of plaintiff's financial distress, its lack of funds or capital, and its inability to obtain money elsewhere, and by reason of the fact that it owed $20,000.00 immediately due, and the fact that it feared that the defendant would take over its dredge and equipment and complete said dredging operation, its will and the will, mind, and resistance of its officers and managing agents was overcome and coerced by defendant, and the plaintiff and its officers and agents were compelled to accede to all of defendant's said terms and conditions."

As to the release clause in Exhibit C:

"That plaintiff at first refused to dredge material from said area at said price and requested 45 cents per cubic yard. That

In considering these various allegations as to duress and coercion, we must bear in mind what the pleadings disclose relative to the character and situation of the parties, and relative to the circumstances surrounding the making of the contracts, Exhibits A, B and C, as well as the subsequent acts and admissions of the parties relative thereto.

The Original Contract (Exhibit A) and the two Supplemental Contracts (Exhibits B and C) were all made by and between two business corporations. There is no showing that either of these corporations dominated the other or that either was dominated by any single individual. No fiduciary relation is shown to have existed between any of the parties. The two corporations acted at arm's length. The contracts (Exhibits B and C) containing the release clauses were not made hastily, but each was preceded by negotiations. These contracts each contained new provisions with reference to the work which were beneficial to plaintiff, and which were carried out. These contracts containing the release clauses were acted upon by the parties after the alleged false representations were known to plaintiff, and the contract, Exhibit C, was made and acted upon by the parties after the full extent of the alleged false representations was known to plaintiff.

The pleadings in the present action show that in a prior action still pending between the parties, plaintiff admitted that the instruments, Exhibits B and C, were contracts validly made and entered into by and between the parties.

The coercion and duress pleaded by plaintiff consist largely of assertions by defendant that it intended to stand upon its legal rights under the original contract and the contract, Exhibit B. The acts threatened by defendant were those provided by the contracts as remedies in case of default. No unlawful act was threatened by defendant.

The words "coercion" and "duress" are not synonymous, although their meanings often shade into one another. "Duress" generally carries the idea of compulsion, either by means of actual physical force or threatened physical force applied to the person (or to some near relative of the person) to be influenced, or applied to the property or reputation of such person. "Coercion" may in-

---

defendant refused to pay 45 cents per cubic yard and demanded and insisted that the plaintiff undertake said work at once at 35 cents per cubic yard 'and threatened that if plaintiff refused so to do, the defendant would declare plaintiff's contract in default, seize plaintiff's equipment, and do said work at plaintiff's expense. That thereupon the plaintiff, by reason of said threats, and acting under said coercion and compulsion, agreed to dredge said material upon the defendant's said terms and conditions.

"That thereupon the defendant and its attorneys drafted a written contract which it presented to the plaintiff for execution; that when plaintiff's president, who was carrying on said negotiations, examined the same, he objected to the release clause embodied therein, stating to the defendant and to the defendant's officers, agents and attorney, that no release had been mentioned in the previous negotiations on said subject and had not been agreed to and that neither he, on behalf of said corporation, nor the plaintiff corporation, would execute the same. That the defendant, knowing that it had a chattel mortgage upon the plaintiff's dredge and equipment and that the defendant held in its hands a large amount of retained percentages on said job which would be due and payable to plaintiff only in the event of the completion of plaintiff's contract, and fully realizing that

plaintiff's only alternative or option was either to accept the contract upon the defendant's terms or abandon its contract, dredge, and equipment and suffer heavy financial loss, and further, knowing and realizing that the plaintiff had suffered heavy financial loss in the performance of the portion of said contract which it had executed, and that the plaintiff was without funds or other financial resources, insisted that the plaintiff execute the said contract exactly upon the terms and conditions as drafted by its attorney and including the release clause in said contract, and threatened that unless the plaintiff executed said contract and continued the dredging operations therein specified, it would foreclose its chattel mortgage, declare plaintiff in default, and continue the dredging operations specified in said contract at plaintiff's expense. That thereby the mind, resistance and will of the plaintiff and of its officer was overcome, and, acting under the influence of the power, coercion, and compulsion of the defendant, the plaintiff and its said officer executed said contract * * *.

"That the execution of said contract Exhibit C, containing the release clause or so-called release, inserted therein by the defendant, was obtained by means of coercion, compulsion and duress practiced and exercised by the defendant upon and over the plaintiff as above alleged."

clude a compulsion brought about by moral force or in some other manner with or without physical force.

No point is made as to the distinction by the parties in the case at bar, and we shall not attempt to observe the distinction.

It is not feasible to review the numerous cases cited by counsel for the respective parties on the subject of duress. A few illustrative ones must suffice.

In United States, Lyon et al. v. Huckabee, 16 Wall. 414, page 431, 21 L. Ed. 457, the court in its opinion used the following language in reference to duress interposed as a defense: "Duress, it must be admitted, is a good defence to a deed, or any other written obligation, if it be proved that the instrument was procured by such means; nor is it necessary to show, in order to establish such a defence, that actual violence was used, because consent is the very essence of a contract, and if there be compulsion there is no binding consent, and it is well settled that moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is sufficient in legal contemplation to destroy free agency, without which there can be no contract, because in that state of the case there is no consent. Unlawful duress is a good defence to a contract if it includes such degree of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness. Decided cases may be found which deny that contracts procured by menace of a mere battery to the person, or of trespass to lands, or loss of goods, can be avoided on that account, as such threats it is said are not of a nature to overcome the will of a firm and prudent man; but many other decisions of high authority adopt a more liberal rule, and hold that contracts procured by threats of battery to the person, or of destruction of property, may be avoided by proof of such facts, because, in such a case, there is nothing but the form of a contract without the substance. Positive menace of battery to the person, or of trespass to lands, or of destruction of goods, may undoubtedly be, in many cases, sufficient to overcome the mind and will of a person entirely competent, in all other respects, to contract, and it is clear that a contract made under such circumstances, is as utterly without the voluntary consent of the party menaced, as if he were induced to sign it by actual violence; nor is the reason assigned for the more stringent rule, that he should rely upon the law for redress, satisfactory, as the law may not afford him anything like a sufficient and adequate compensation for the injury."

In Silliman v. United States, 101 U. S. 465, 25 L. Ed. 987, it appeared that claimants had delivered certain barges to the United States under charter parties. Later the Quartermaster's Department demanded that claimants should execute new charter parties containing material changes. Claimants at first refused, but later executed the new charter parties and received payments under the same. Still later, claimants sued on the original charter parties, claiming that the new charter parties were executed under duress. The Supreme Court in its opinion said (page 470 of 101 U. S.,):

"Duress of, or in, what? Not of their persons, for there is no pretence that a refusal, on their part, to accede to the illegal demand of the quartermaster's department would have endangered their liberty or their personal security. There was no threat of injury to their persons or to their property, to avoid which it became necessary to execute new charter-parties. Nor were those charter-parties executed for the purpose, or as a means of obtaining possession of their property. They yielded to the threat or demand of the department solely because they required, or supposed they required, money for the conduct of their business or to meet their pecuniary obligations to others. Their duty, if they expected to rely upon the law for protection, was to disregard the threat of the department, and apply to the courts for redress against its repudiation of a valid contract.

"We are aware of no authority in the text-books or in the adjudged cases to justify us in holding that the last charter-parties were executed under duress. There is present no element of duress, in the legal acceptation of that word."

In Hartsville Oil Mill v. United States, 271 U. S. 43, 46 S. Ct. 389, 390, 70 L. Ed. 822, the appellant had made a contract with the United States Government to furnish "cotton linters." The contract contained a clause authorizing the government to cancel it "in the event of the termination of the present war." "In November, 1918, after the Armistice, negotiations were begun between the Cotton Products Section of the War Industries Board and a committee representing appellant and other manufacturers, for the adjustment and settlement of all obligations upon appellant's contract of September 26th

and all similar contracts. In the course of these negotiations it was contended by the representatives of the government and denied by the committee that the termination of the war had occurred, within the meaning of the cancellation clause." Finally the government, through its duly authorized officers, "notified the committee that, unless this proposal was accepted within one hour from the time it was made, the government would refuse to perform its contracts, and would refuse to accept or pay for any linters, either on hand with the manufacturers or afterwards produced by them, and that appellant and other manufacturers could seek their remedy in the courts. Within the hour the committee, although protesting against the government's interpretation of the contract and the position taken by its representatives, notified them that the manufacturers would accede to the proposed modification of their contracts."

Later the claimant sued in the Court of Claims (60 Ct. Cl. 712) and was defeated. The Supreme Court, in reviewing the judgment, said (page 47 of 271 U. S., 46 S. Ct. 389, 391):

"The findings of the Court of Claims establish appellant's right to recover under the earlier contract, if it was not modified by the later one. Appellant urges that the later contract does not bar such recovery because the coercive measures resorted to by officers of the Ordnance Department, to induce its execution, amount in law to duress, rendering the second contract invalid and without force to modify the first. * * * It is contended that the government's refusal to carry out the contracts would have resulted in the failure of the scheme for the stabilization of the price of cotton seed and its products, and in the collapse of the business structure which had been reared upon the basis of the stabilized price, and that great loss would have resulted to appellant and other manufacturers. * * *

"In applying to the facts of this case the principles which control duress as a legal ground for avoidance of a contract, we are limited to such conclusions of law as may be drawn from the fact, found by the court below, that appellant signed the settlement contract after negotiations, in the course of which the threat was made that the government would disregard the admitted obligations of its contracts unless those entitled to the performance of them would yield to its demands. This threat was discreditable to the officers who made it and injurious to the government, whose high obligation to deal justly and according to law, with those with whom it had contracts, might well have been their first concern. But a threat to break a contract does not in itself constitute duress. Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate. * * *

"Here the appellant is confronted with the finding that it has executed a formal contract which bars its recovery unless it sustains the burden of proving duress."

In Morton v. Morris, 72 F. 392 (C. C. A. 8), a suit was brought to foreclose two mortgages given in part settlement of an account. The answer and also a cross-bill alleged coercion in the making of the mortgages. Demurrer was sustained to the cross-bill, and a foreclosure of the mortgage was ordered. On appeal this court said (page 397 of 72 F.):

"On the argument of the case some stress was laid on the averments contained in the answer to the effect that the defendant was called upon for a settlement when he was largely in debt, and when the times were unpropitious; also on the averment that the demand was made at that time by the plaintiff in bad faith, to coerce an inequitable settlement. These averments are not sufficient, in our opinion, to entitle the defendant to equitable relief. In the world of business it is usually the case that men are most urgently pressed to pay their debts when they are deeply involved, and the times are stringent, or when a financial panic is imminent. On such occasions the instinct of self-preservation often compels creditors to be more prompt and persistent, if not more exacting, in enforcing their demands, than they would be under other conditions. * * *

"With reference to the allegation contained in the answer and cross bill that the demand for an accounting was made in bad faith, to coerce an unjust settlement, it is only necessary to say that, inasmuch as the acts done and performed by the complainant were clearly lawful, we fail to perceive that the motives which may have prompted him to demand a settlement and an accounting are at all material. The intent which actuates a creditor in seeking to enforce a legal claim or demand is ordinarily of no concern to the debtor, and is not a matter for judicial inquiry. The latter is only entitled to complain when some act is done or threatened by the creditor which is, in itself, unlawful, or is contrary to equity. In the pres-

ent case the acts charged in the answer as the basis for relief consisted in a demand made by the plaintiff for an accounting and settlement when the defendant was in embarrassed circumstances, and in a threat to enforce such demand by a civil action. Neither of these acts was unlawful, or so far harsh, oppressive, or unconscionable as to vitiate the settlement subsequently made."

In Dick v. Marx & Rawolle, 55 App. D. C. 267, 4 F.(2d) 879, suit was brought on a promissory note. One defendant, in his plea in defense, set up: " * * * that plaintiff claimed a balance due under said contract of approximately $30,000, whereas said defendant claimed, by reason of the nondelivery of goods when promised, and the subsequent increase in the market value thereof, that he and said company had been damaged to an even greater sum, and therefore owed the plaintiff nothing; that plaintiff, well knowing all the facts, and knowing that said defendant would be financially ruined if he could not secure an extension upon his indebtedness to the banks aforesaid, for the purpose of securing an unfair advantage over the defendant, and compelling him to pay a debt not justly due, threatened to commence bankruptcy proceedings against him, and by means of such threats coerced and intimidated these defendants into signing the note sued upon, against their will, in order to prevent even greater financial loss by reason of the threatened proceedings."

The lower court ordered judgment for plaintiff.

The appellate court in its opinion said [page 880 of 4 F.(2d), 55 App. D. C. 267]: "Under the circumstances set out in the affidavit, however, the alleged threat of the plaintiff did not constitute fraud or duress, for the plaintiff had a lawful right to commence such proceedings against the defendant, in order to secure or collect the claim which it was then asserting against him. The following quotation from 13 Corpus Juris, p. 399, together with the citations there given, is in point: 'A threat to do what one has a legal right to do cannot constitute duress, such as to foreclose or to exercise the power of sale on a mortgage, a threat of arrest, or arrest on civil process on a legal claim, when such arrest is allowed by law, or a threat of, or the bringing of, a lawsuit or civil process, or a threat to levy an attachment or execution or to file a mechanic's lien.' "

See, also, Barrows v. Mutual Reserve Life Ins. Co. (C. C. A.) 151 F. 461; Connolly v. Bouck, 174 F. 312 (C. C. A. 8); Marshall v. Lovell, 19 F.(2d) 751, 754 (C. C. A. 8); First National Bank & Trust Company v. Stock Yards Loan Company, 65 F.(2d) 226 (C. C. A. 8).

Plaintiff in the case at bar contends that the question of the existence of duress was for the jury, and that the court erred in ordering judgment on the pleadings.

Whether alleged facts, pleaded as constituting duress, existed, if the existence of those facts is denied, is a question for the jury.

Whether the alleged facts are sufficient to constitute duress is a question of law. This was the holding in Meyer v. Guardian Trust Co., 296 F. 789 (C. C. A. 8), and in Winget v. Rockwood, 69 F.(2d) 326 (C. C. A. 8).

In the case at bar, plaintiff in its pleadings has alleged certain facts and has also alleged the conclusion that those facts constituted duress. The trial court apparently assumed the facts to be true and held as a matter of law that they were not sufficient to constitute duress.

A careful consideration of the facts alleged or admitted in plaintiff's pleadings, viewed in the light of the authorities heretofore cited, has convinced that the ruling of the trial court was right.

The Winget Case, above cited, is to be distinguished by numerous differences of fact and especially by the fact that in that case there was a fiduciary relation existing between the parties to the contract alleged to have been made under duress.

The second cause of action in the case at bar is based upon alleged warranties. These alleged warranties consisted of the same alleged representations which are set out in the first cause of action, and which are there used as the basis for that cause of action in deceit.

The two causes of action being based upon the same alleged misrepresentations may, for the purposes of the present appeal, be treated as one. This is apparently the view taken by appellant, for in its brief it says: "Appellant's claim is therefore that if before the contract, Exhibit A, was executed appellee, whether orally or in writing (as is true in the present case), represented to appellant that the material to be dredged consisted of 10% gravel and the balance sand and this representation induced the contract and this representation was false, then appellee is liable for any damages resulting whether

the action being brought against them is called an action in deceit or an action upon the warranty."

It would seem to follow that since the release clauses in the contracts Exhibits B and C were broad enough to cover any false representations of fact, it would not matter whether they are called false representations giving rise to an action of deceit, or false representations giving rise to an action for breach of warranty.

The releases, if not invalid for duress, barred both forms of action, because both are founded on the same state of facts.

■ Our conclusion is that the facts (as distinguished from the conclusions of law) alleged in plaintiff's pleadings are not sufficient to show duress in the making of the contracts B and C; and that the releases constitute a bar to the relief demanded by plaintiff in the present action.

As the foregoing disposes of the appeal, we find it unnecessary to discuss other questions raised by counsel for the respective parties.

The judgment is affirmed.