OSKEY GASOLINE AND OIL COMPANY, INC., a Minnesota Corporation, Appellant,

v.

CONTINENTAL OIL COMPANY, a Delaware Corporation, Appellee.

No. 75–1374.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1976.

Decided April 22, 1976.

Solly Robins, Stanford Robins and Deborah J. Palmer, Minneapolis, Minn., for appellant.

* ASSOCIATE JUSTICE TOM C. CLARK, Retired, United States Supreme Court, sitting by designation.

Daniel R. Shulman, Minneapolis, Minn., for appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and BRIGHT, Circuit Judge.

BRIGHT, Circuit Judge.

Oskey Gasoline and Oil Company, Inc. (Oskey) appeals from a summary judgment dismissing in substantial part its complaint seeking damages against Continental Oil Company (Continental) for breach of contract (count I) and for antitrust violations of the Clayton Act (15 U.S.C. §§ 15 and 26), and the Sherman Act (15 U.S.C. § 1) (count II).[1]

The district court dismissed the contract action as unenforceable under the applicable Minnesota Statutes of Frauds and ruled that a release of claims executed by appellant Oskey in favor of Continental on June 6, 1969, barred any contract or antitrust claims accruing prior to that date. Appellant disputes these rulings on this appeal. We agree with the district court that the contract and antitrust claims are limited by the release, notwithstanding our view that the statutes of frauds do not serve as an absolute bar to the contract action.

In 1969, the principals of Oskey organized Oskey as a wholesale distributor of heating oil and gasoline to serve the upper midwestern part of the United States. During March of 1969, Oskey and Continental reached an oral agreement whereby Continental agreed to supply Oskey with heating oil and gasoline through a number of Continental's distribution terminals. Continental granted Oskey a line of credit for $300,000, to apply to Oskey's purchases. During the latter part of March 1969, Oskey drew off about 50 thousand gallons of petroleum products from Continental terminals for resale. On March 31, 1969, with no warning given to Oskey, Continental sent telegrams to its terminals cancelling all sales to Oskey effective immediately.

1. The district court entered an appropriate Rule 54(b), Fed.R.Civ.P. certification, thus permitting an appeal from the adjudication of "fewer than all of the claims."

This interruption of petroleum supplies caused a substantial crisis in Oskey's business and Oskey undertook negotiations with Continental in an effort to reopen that source of supply. As a consequence of these negotiations, Continental eventually agreed to a written contract to supply Oskey with 10 million gallons of petroleum products during 1969 at Continental's Cadott, Wisconsin, terminal. Contemporaneously with this contract, Oskey and Continental executed an agreement mutually releasing each other from claims arising prior to June 6, 1969, the date of this "mutual agreement."[2]

The district court ruled that the two Minnesota Statutes of Frauds barred contractual claims in count I and that the mutual release signed June 6, 1969, also barred count I as well as all claims on count II prior to June 6. The appellant asserts that the district court committed error in these rulings. We separately discuss each of these issues.

I. *Statutes of Frauds.*

■ The district court construed the complaint for breach of contract as one seeking damages for breach of a contract which extended over a period of more than one year. As such, the court applied the provisions of Minnesota's one-year statute of frauds[3] to bar the contract action.

Additionally, the district court ruled the contractual claim to be unenforceable under the Uniform Commercial Code provision requiring a contract in writing for a sale of goods for a price of five hundred dollars or more. Minn.Stat. § 336.2–201.[4]

The appellant does not contend that the various memoranda surrounding the March 1969 oral agreement satisfies the stringent requirements of the one-year statute of frauds provision, Minn.Stat. § 513.01. Rather, Oskey relies upon the more liberal provisions of the Minnesota Uniform Commercial Code (*see* n.4 *supra*) and asserts that the record establishes a contract for the sale of goods; that the oral contract was evidenced by other writings; and that the quantity is established at approximately 50 million gallons per year.[5] As alternative proof of compliance with the UCC provision, Oskey relies on deposition testimony of a high-level Continental manager,[6] which appellant contends establishes an enforceable contract under Minn.Stat. § 336.2–201(3)(b), for the quantity admitted by Continental.

---

2. Appellant also claims that Continental, in breach of this supplementary contract, interrupted this source of supply temporarily during October of 1969. The district court did not consider nor dispose of this claim.

3. Minn.Stat. § 513.01 reads in relevant part:
 No action shall be maintained, in either of the following cases, upon any agreement, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith:
 (1) Every agreement that by its terms is not to be performed within one year from the making thereof * * *.

4. This provision reads in relevant part:
 (1) Except as otherwise provided in the section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insuf-

ficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
 * * * * * *
 (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
 * · * * * *
 (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted * * *.

5. This figure is arrived at by dividing the average price per gallon into the $300,000 (the line of credit granted Oskey by Continental), and multiplying the result by the number of Continental's billing periods in a year.

6. Robert S. Bramlett, manager of wholesale light oil sales for Continental and the individual who negotiated the initial supply arrangement with Oskey for Continental.

The district court did not directly reach these contentions for its construed the appellant's complaint as asserting a right of recovery for a contract extending over several years. Although appellant's principals interpreted the oral agreement as extending beyond one year, appellant offered no documentation to support that construction of the oral agreement. We agree with the district court that Minn.Stat. § 513.01 bars any action on a multi-year contract theory. However, the amended complaint alleges a contract " * * * under the terms of which defendant agreed to sell to plaintiff approximately 50 million gallons of gasoline and heating oil within a period of approximately one year * * *." Thus, the district court was obligated to consider whether the evidence could justify a jury determining that the parties had agreed to an oral contract to be performed within one year, and hence, not reached by the general statute of frauds (Minn.Stat. § 513.01) but covered by the UCC provision. In determining the propriety of summary judgment of dismissal of the contract action, we need only consider appellant's alternative contention that the oral contract could be enforced to the extent admitted by Continental.

From our review of the record, we conclude that the plaintiff produced sufficient evidence to overcome the defendant's contention that the UCC Statute of Frauds provision constitutes a defense in this case as a matter of law.

Mr. Robert S. Bramlett testified in his deposition testimony as follows:

Vern [Oskey] made a pretty good pitch as to his goals; what he planned to do with the new company, indicating that he had—he wanted more than one supplier and that he was interested in *buying up to fifty million gallons a year.* I said, *"Well, we're interested in selling the product,"* and we agreed to sell it—or put it in singular, I agreed to sell it, subject to credit clearance and other clearances back at the home office. [Emphasis added].

Appellant's attorney questioned further:

[By Mr. Robins (appellant's attorney)] At the time you entered into your discussion with Mr. Oskey and then instructed Mr. Dodson [of Continental] to do the paper work, what period of time, assuming things went well now, and assuming that—let's assume that you managed to sell product and product was available and so forth, in the normal course of events, how long were you thinking that that transaction would last or how long would you be selling to Oskey?

&ast; &ast; &ast; &ast; &ast; &ast;

[Mr. Bramlett] Well, to answer your question, so far as I was concerned, it could go on indefinitely. Again, subject to change on reasonable notice.

Although, as we have already noted, the appellant's officers testified that they believed that the contract extended for a term of several years, and the appellee believed it was engaging in a "spot" sales arrangement,[7] the agreement was an oral one and from Bramlett's testimony, with support from certain documents in evidence, a jury could find that Continental agreed to supply up to 50 million gallons of petroleum products to Oskey within a one year period.

As noted above, the Uniform Commercial Code Statute of Frauds provision governing sales of goods permits recovery if "the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted * * *." Minn.Stat. § 336.2–201(3)(b). Here, Continental does not deny that it made some agreement for sale of petroleum products to Oskey and indeed, the written documentation discloses a $300,-000 credit authorization and the various

---

7. Within the petroleum industry, a "spot" sale is a sale under which neither party makes a commitment to do business with the other party for any minimum period of time. It is often done when a supplier has a temporary over-supply of product. A "term" sale is a sale in which each party commits itself to deal with the other for some stated minimum period of time.

sales actually made in the month of March. The crucial question on this point focuses on whether Mr. Bramlett's testimony constitutes an admission of a term contract or whether he was speaking exclusively of a spot contract, *i. e.,* did Continental have an agreement to furnish petroleum products to Oskey in addition to the 50 thousand gallons supplied in March of 1969?

The "spot sales" theory of Continental, if established, would appear to be dispositive of count I on the merits as well as establish a statute of frauds defense. A jury, however, could well take Bramlett's testimony quite literally as promising to supply Oskey's needs in one year up to 50 million gallons of petroleum products and, thereby, reject appellee's "spot sales" contention.

The district court, therefore, erred in granting summary judgment on count I based on the statutes of frauds defense.

## II. *Whether the Mutual Release is Voidable by Oskey.*

As noted above, Continental cut Oskey off from obtaining supplies at all of its terminals on March 31, 1969. However, on June 6, 1969, Continental agreed to supply Oskey with 10 million gallons of gasoline at its terminal in Cadott, Wisconsin. As a condition precedent for this action, Oskey signed a document entitled, "mutual release,"[8] by which the parties mutually released each other from claims arising prior to June 6, 1969.

The district court found that the express terms of the release barred any claims by appellant Oskey Gas and Oil Company, Inc. against Continental and the court rejected appellant's contention that Continental obtained that release under conditions of economic duress and coercion. For reasons stated in the district court opinion, we agree that the release bound the appellant corporation in addition to the individuals named therein. We turn to Oskey's challenge that the release is now voidable for economic coercion and duress.[9]

■ In ruling against Oskey, the district court relied primarily on this circuit's decision in *W. R. Grimshaw Company v. Nevil C. Withrow Co.,* 248 F.2d 896 (8th Cir. 1957),

**8.** This release reads in full:

MUTUAL AGREEMENT

OSKEY GAS & OIL COMPANY, INC.
A MINNESOTA CORPORATION WITH
HEADQUARTERS AT
2950 Metro Drive
Minneapolis, Minnesota

VERNON J. OSKEY, individually and as Attorney-in-Fact for James W. Emison (hereinafter jointly called First Party or party referred to as First Party) and CONTINENTAL OIL COMPANY, a Delaware corporation, with headquarters at 30 Rockefeller Plaza, New York, New York, (2nd Party) hereby agree as follows:

First party and second party each hereby releases the other, its officers, directors, employees and agents from all claims and demands (excdpt [sic] such sums as are owing second party on the account of Oskey Gas & Oil Company, Inc. for products sold it by first party) which either of them now has against the other resulting from or in connection with any course of dealings, agreement or other act or omission to this date. VERNON J. OSKEY undertakes and agrees to indemnify second party and hold it harmless from all costs, losses or expenses of any kind which it may

incur as a result of any claim arising to date by JAMES W. EMISON.

V.J.O.

Dated this 6th day of JUNE ~~May~~ 1969.

Vernon J. Oskey [/s/]
Individually and as Attorney-in-Fact for JAMES W. EMISON
OSKEY GAS & OIL COMPANY, INC.
(First Party)
By: Vernon J. Oskey [/s/]
CONTINENTAL OIL COMPANY
(Second Party)
By: James L. McCulley [/s/]

**9.** In examining the rationale of the district court's determination on summary judgment, we are cognizant of this circuit's statement in *Ozark Milling Co. v. Allied Mills,* 480 F.2d 1014 (8th Cir. 1973), where we noted that summary judgment

is an extreme remedy, one which is not to be entered unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances. [*Id.* at 1015.]

*Accord, Saal v. Mielke,* 492 F.2d 1184, 1185–86 (8th Cir. 1974); *Luick v. Graybar Electric Co.,* 473 F.2d 1360, 1362–63 (8th Cir. 1973).

*cert. denied,* 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958). In that case we noted that one challenging a release as invalid because of economic coercion or duress must establish three elements:

(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. [*Id.* at 904.]

In rejecting the economic duress and coercion theory, the district court determined that the second element of *W. R. Grimshaw*—lack of other alternatives—was not established in this case. The court noted that Oskey had a second source of supply for most of the area in which it was operating. At the time, Farmland Industries, Inc. supplied petroleum products to Oskey in most of Oskey's operating areas except for parts of Wisconsin.

The district court also noted two alternative reasons for upholding the validity of the mutual release. First, the court found that Oskey possessed adequate legal remedies which it chose not to pursue and second, that Oskey ratified the validity of the release by accepting the benefits of the release without renouncing it or seeking an early judicial declaration of its invalidity.

■ In general, whether the particular facts, as alleged, are sufficient to constitute a defense of duress is a matter of law for the court while the question of whether the facts alleged actually exist is a jury issue. *W. R. Grimshaw Company v. Nevil C. Withrow Co., supra,* 248 F.2d at 902; *McKenzie-Hague Co. v. Carbide & Carbon Chemicals Corp.,* 73 F.2d 78, 85 (8th Cir. 1934).

In *W. R. Grimshaw, supra,* we also said that

[i]n order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities. [248 F.2d at 904.]

*See also First National Bank of Cincinnati v. Pepper,* 454 F.2d 626, 632–33 (2d Cir. 1972); *McKenzie-Hague Co. v. Carbide & Carbon Chemicals Corp., supra,* 73 F.2d at 82–85; *Wallner v. Schmitz,* 239 Minn. 93, 57 N.W.2d 821, 824 (1953).

To establish its claim of duress and economic coercion, plaintiff relies on statements of Vernon Oskey and James W. Emison, two of the principals in Oskey Gasoline and Oil Company. We summarize that evidence.

During the first five or six days in April 1969, the period immediately after the March 31 cutoff, Vernon Oskey and Leonard Jaskowiak (a third principal in Oskey) attempted, without success, to contact various representatives of Continental. Oskey also utilized his attorney in attempting to arrange a meeting with Continental. Finally, Emison succeeded in obtaining an appointment to see A. W. Tarkington, president of Continental. Accompanied by Jaskowiak, Emison met with Tarkington on April 14, 1969. Mr. Tarkington advised Emison and Jaskowiak that the entire matter was to be handled by a Mr. Bill Burnap of Continental's Houston office. At this meeting, Emison advised Tarkington that Oskey was not interested in any legal proceedings against Continental.

Emison then contacted Mr. Burnap in Houston by telephone. Burnap initially stated that he would not discuss the matter with Emison because of "potential legal complications." Emison pointed out that the only reason Oskey's attorneys had become involved in the case was because no one at Continental would take Vern Oskey's calls but Mr. Burnap responded that regardless of the reasons, the intervention of Oskey's lawyers had made the problem a legal matter. Burnap stated that he would not engage in discussions with Emison until he had been authorized to do so by the

Continental legal staff. At that time, Emison advised Burnap of his view that

> Continental's precipitous action in cutting Oskey's off had damaged Oskey's reputation, wasted a lot of Oskey's money, destroyed their salesmen's confidence in them, destroyed Oskey's customers' confidence in them, and generally turned their company upside down.

After a lapse of about three weeks, one of Oskey's lawyers who had discussed the problem with Continental's legal staff, advised Emison that he could meet with Burnap in Houston.

Emison and Jaskowiak met with Burnap in Houston in late April or early May of 1969.[10] At this meeting, Emison stated that Oskey had been unable to secure a supplementary supplier because of Continental's cutoff and that "the whole situation was a disaster." Burnap responded that Continental, as a net buyer of petroleum products, was in fact extremely short of these products and simply had found it necessary to stop selling to Oskey. Mr. Emison offered to take a lesser quantity of petroleum products at only a few terminals and further stated that as a representative of Oskey he had come to the meeting in a "spirit of compromise to see if something couldn't be done to right the situation."

At this point, Burnap suggested that perhaps Continental would be able to sell to the Oskey Company at two terminals for up to 20–30 days until Oskey was able to arrange a new source of supply. Emison declined this proposal, stating that Oskey's reputation had been so damaged in the industry that no other petroleum supplier had expressed any interest in selling to Oskey. At the conclusion of the meeting, Burnap indicated that he would check with the Continental Supply and distribution personnel and would advise of Continental's ability to supply Oskey with any petroleum products.

About two weeks later a Mr. James McCulley of Continental called Vern Oskey and arranged for a meeting in Chicago. At that meeting McCulley produced a computer printout which, according to McCulley's statement, disclosed that Continental's own needs exceeded its production.

At this meeting McCulley indicated to Mr. Oskey that Continental might make some product available at the Cadott, Wisconsin, terminal provided Oskey released its claims against Continental. Oskey inquired whether Continental could supply petroleum products at Wrenshall, Minnesota.[11] At a later point in the meeting, McCulley suggested supplying Oskey until August 31, 1969, with five million gallons of product at the Cadott, Wisconsin, terminal at a stated price. Mr. Oskey refused this proposal because "the pricing and volume proposed were of absolutely no business use * * *."

Subsequently, McCulley, in a letter dated May 15, outlined a similar proposal which Mr. Oskey rejected in a telephone conversation with McCulley.

In a letter of June 4, 1969, McCulley submitted a further proposal to Oskey. On June 6, 1969, the parties reached an agreement in writing whereby Continental promised to supply Oskey with 10 million gallons of petroleum product at the Cadott, Wisconsin, terminal during the remainder of 1969. The execution of this agreement was subject to Oskey signing the release here in question.

In arguing the theory of economic duress and coercion, Oskey claims that Continental's unilateral cutoff caused it to lose its ability to service its customers and virtually destroyed its reputation and business and that it signed the release only because it desperately needed the supplies. In his deposition, Mr. Oskey summarized as follows:

10. Two of Continental's attorneys were present at this meeting. One of them was apparently the chief antitrust counsel for Continental. Neither of the attorneys from Continental made any comment during the course of the meeting.

11. McCulley replied negatively, stating that no need existed since Oskey was already drawing petroleum supplies at that point from Farmland Industries and Farmland in turn obtained its petroleum products from Continental.

\* \* \* I met [McCulley] in Chicago and we discussed—in other words we were just grasping for straws at that time to save our company. We just started. When the industry found out we were cut off we were just scrambling like hell trying to explain to customers and it was in trade papers about our being cut off and we were getting phone calls by the hundreds, to be frank with you, from customers, publications, asking us what we were going to do, fold our company, what should we do?

Vern Oskey recognized that the new June 6, 1969, agreement did not provide for an adequate alternate source of petroleum supplies but his hope was that Continental, in resuming its function as a supplier, would recognize the Oskey Company as "honorable" and would honor the "original contract."

■ While Vern Oskey now offers the conclusion that he executed the mutual release under duress and economic coercion, the facts viewed most favorably to appellant [12] in sum establish that after Continental's alleged breach of contract, Oskey's principals initiated new negotiations looking toward resumption of supply arrangements with Continental in a spirit of compromise. The record shows that Oskey had obtained legal counsel. Its principals were obviously informed of Oskey's legal rights but released any potential claims in exchange for a source of additional petroleum products from Continental. Oskey rejected some early tentative proposals submitted by McCulley of Continental but accepted the 10 million gallon proposal for delivery through the pipeline terminal at Cadott, Wisconsin. In doing so, Oskey recognized the inadequacy of this quantity of product, but hoped that a resumption of relationships would ultimately result in Continental providing far more gallonage to Oskey than as stipulated in the new contract. The facts also demonstrate, as recognized by the district court, that during 1969, Oskey obtained petroleum supplies through another supplier (Farmland) and that Oskey accepted the benefits of the new supply contract with Continental without any disavowal. Finally, the record makes eminently clear that Continental engaged in negotiations with Oskey's principals upon the representations that Oskey desired meaningful discussions with Continental and was not interested in "legal action" against Continental.

■ Applying the standards outlined in *W. R. Grimshaw, supra,* the evidence fails to show any oppressive conduct by Continental inducing Oskey to execute the mutual release. The economic necessities experienced by Oskey can be attributed to Continental's initial alleged breach of contract, but that action gave rise to the alternative of a breach of contract suit which Oskey rejected in favor of a new supply contract with Continental.

Accordingly, summary judgment is sustained to the extent that it dismisses Oskey's claims under counts I and II arising from actions of Continental prior to June 6, 1969, on the ground that the release executed by the parties on that date bars appellant's claims (contract and antitrust) which may have accrued on or before June 6, 1969.

We remand to the district court for further proceedings.

---

**12.** We so construe the facts in reviewing the summary judgment dismissing appellant's claims. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970); *Ozark Milling Co., Inc. v. Allied Mills,* 480 F.2d 1014, 1015 (8th Cir. 1973); *Saal v. Mielke,* 492 F.2d 1184, 1185 (8th Cir. 1974).