GLICKSTEIN, Judge,
concurring specialty-
This is an appeal and cross appeal, both of which this court has affirmed, from a *859 final judgment of dissolution tried pursuant to the parties’ pre-trial stipulation, which recites, in part:
The Husband admits the execution of the Separation and Property Settlement Agreement dated June 18, 1984, but alleges that the Respondent/Husband was not well nor represented by counsel and that he signed the same under duress, and that the same is not fair and equitable and should be rejected by the Court.
The property settlement provided as follows:
1. The husband was to convey to the wife all of his interest in the marital home.
2. In the event any legal proceedings were instituted for dissolution of marriage, the husband agreed to pay $850.00 per month as permanent alimony to the wife until death or remarriage.
3. The parties agreed that the wife would receive the 1983 Oldsmobile Cutlass, and that the husband would own the 1977 Cadillac in his name.
4. The husband agreed to pay to the wife the sum of $15,000.00 from his savings at the credit union with his employer.
5. The husband was to continue to pay health and accident insurance premiums covering the Wife.
6. The husband agreed to pay all reasonable attorneys’ fees and costs that the wife may incur in the event of a Final Judgment of Dissolution or other legal proceedings.
The trial court, after considering the evidence, announced to the parties with respect to their agreement that it found the agreement:
[fjacially unreasonable and so financially burdensome and onerous that it should be set aside.
It also said:
That there was no reason for the wife to receive all of the house, which makes it facially unreasonable and; based upon the other facts and testimony that I have heard, that the wife imposed her will on the husband in obtaining his signature, not physical but mental coercion and duress, it is thereupon, ordered and adjudged that the parties are granted a final judgment of dissolution of marriage, that the parties shall have the marital home at the address, lot 119, Village of Wood Lake as tenants in common.
* * * * * *
The court specifically finds that both parties have put in an equal share, and neither party is entitled to any special equity in the home, that the $32,000 from the wife is equalled by the approximate $32,000 by the husband and that the additional ten thousand dollars came from joint assets, that the wife is entitled to permanent alimony based on the length of the marriage and, accordingly, he shall pay $245 bi-monthly to the wife, that is on the 1st and 15th of each month with each of his paychecks, that the wife is entitled to a reasonable attorney’s fee which the Court finds to be $4,000.00, and accordingly, judgement is entered against the husband for $4,000.00 in favor of the wife’s attorney for which amount let execution issue.
It then set aside the agreement, directed that the parties shall own the marital home as tenants in common, awarded permanent alimony to the wife of $425.00 bi-monthly as well as an attorney’s fee of $4,000, $15,-000 of the funds held by the husband in his credit union, and medical and health insurance so long as the husband’s employer makes it available, thus retaining some aspects of the agreement and vitiating others.
The marriage commenced in 1973. At the time of final hearing the wife was 64 and the husband was 56. She was then unemployed. Her assets consisted of the marital home, automobile and furniture. The husband’s gross income with a major company was $2,944.00 per month. His assets consisted of $30,000.00 in his retirement fund and personal property.
The husband commenced an affair in February, 1984, with a woman in Connecti *860 cut, where his employment took him, and told the wife about it sometime before June 1984 when the agreement was signed. The wife testified it was the husband’s idea that she retain an attorney to prepare an agreement. He does not refute that. She claims the husband had the agreement for eight days and read it eight times. He says he received it four days before signing it and that he read it once.
She claims she quit her job at a bank in 1979 when her mother-in-law moved into the parties home; and that she cared for her husband’s mother 24 hours a day until the latter went into a nursing home. The husband claims she quit before his mother moved in but does not dispute great care and attention of his mother.
The parties’ mutual anger at final hearing was evident by their respective descriptions of the other. She accused him of having communicated a venereal disease from his affair, which he denied. It was cured by four pills, according to the wife.
The wife contends here that the trial court should have left the agreement alone and erred in not recognizing the wife’s special equity in the marital home. The husband contends that the trial court did not go far enough and erred in awarding the wife permanent alimony and attorney’s fees. The panel has affirmed and this writer believes that he should not substitute his judgment for that of the trial court in the result; but I wish to discuss a number of matters.
I
The first question to be considered is the trial court’s conclusion of the agreement’s facial unreasonableness, the basic impact of which is to return to the husband his one-half interest in the marital home.
Pursuant to the agreement the husband had conveyed the marital home to the wife in June 1984. Final hearing occurred in the fall of 1985. Evidence in the record to support the numbers recited by the trial court include (a) the wife’s testimony that she used the $32,000 from the sale of her Ohio home in 1974 to pay off a $10,000 mortgage on the husband’s Florida home and to improve it prior to its sale; and (b) her testimony that the husband's mother received $28,000 from the sale of her home which was deposited into the parties’ joint account and used to pay for the marital home in contention.
This writer cannot determine how the figure of $32,000 on the husband’s side of the ledger was derived. He testified that his portion of the purchase price of the marital home for $73,000 was $40,000 but he does not explain the figure. Notwithstanding the absence of obligation on the part of the trial court to make specific findings of fact as eliminated by Vandergriff v. Vandergriff, 456 So.2d 464 (Fla.1984), it would have been of great assistance if they had been made with specificity.
Nevertheless, and bearing in mind that an appellate judge is bound by the reasonable person test of Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), the writer does not perceive a defensible reason to reverse the trial court’s conclusion. Fleming v. Fleming, 474 So.2d 1247, 1248 (Fla. 4th DCA 1985), echoed earlier decisions in that although the term “facially unreasonable” might suggest otherwise, in weighing the fairness and reasonableness of the provision the courts will consider the relative situation of the parties, their respective ages, health and experience, their respective properties, their family ties and connections and such other factors as tend to show whether the agreement was understandingly made. Del Vecchio v. Del Vecchio, 143 So.2d 17, 20 (Fla.1962); Baker v. Baker, 394 So.2d 465 (Fla. 4th DCA 1981); Bailey v. Bailey, 300 So.2d 294 (Fla. 4th DCA 1974). The trial court apparently did so.
II
The burden was upon the husband to prove his assertion in the pre-trial stipulation as to the agreement. While duress is expressed therein, there is no mention of coercion.
*861 The record is void of any evidence of duress. As that term has been used in a family law setting, the writer agrees with the First District Court of Appeal, which said in Paris v. Paris, 412 So.2d 952, 953 (Fla. 1st DCA 1982):
We agree that there can be no duress without there being a threat to do some act which the threatening party has no legal right to do — some illegal exaction or some fraud or deception. See Fuller v. Roberts, 35 Fla. 110, 17 So. 359 (1895); Kohen v. H.S. Crocker Co., 260 F.2d 790 (5th Cir.1958); 25 Am.Jur.2d Duress & Undue Influence, § 5.
In a setting involving avoidance of a contract, the court said in Corporacion Peruana de Aeropuertos y Aviacion Comercial v. Boy, 180 So.2d 503, 505 (Fla. 2d DCA 1965):
In another early Florida case, Herald, et al v. Hardin, Fla.1928, 95 Fla. 889, 116 So. 863, the Florida Supreme Court defined duress as follows:
“Duress is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition.”
There can be no legal duress, however, unless the act of the party compelling the obedience of another is unlawful or wrongful; Fuller, et al v. Roberts, Fla. 1895, 35 Fla. 110, 17 So. 359, and the burden of proof to show duress and the illegality of the embargo is on the Defendant. Hough v. Menses, Fla.1957, 95 So.2d 410.
Id. at 505. See also Norris v. Stewart, 350 So.2d 31 (Fla. 1st DCA 1977), and other cases cited therein. In a setting of criminal law, the supreme court, in discussing “extreme duress,” as expressed in section 921.141(6)(e), Florida Statutes (1981) said:
“Duress” is often used in the vernacular to denote internal pressure, but it actually refers to external provocation such as imprisonment or the use of force or threats. See Guralnik, New World Dictionary of the American Language (2d college ed. 1974).
Toole v. State, 479 So.2d 731, 734 (Fla.1985).
Ill
The word “coercion” does not appear in the parties’ pre-trial stipulation. During the writer’s search for a definition of the word by Florida courts, Words & Phrases in Florida Digest disclosed an interesting case now almost half a century old. In Lloyd v. Lloyd, 132 Fla. 673, 182 So. 237 (1938), the court said:
The proof amply establishes that Lloyd was the father of the child and that he recognized his responsibility and definitely agreed with the girl and her aunt that he would marry the girl on the following Monday after the agreement with them on Saturday. Lloyd was twenty-eight years of age and the girl was twenty-three.
The girl’s aunt heard that Lloyd intended to leave the State and she told her husband, Mr. Mitchell, a police officer in Miami, about the condition of the girl, the agreement and Lloyd’s reported intention to leave the State before complying with his agreement. Mitchell went to Fort Lauderdale, got a deputy sheriff, returned with the deputy to Hollywood where Lloyd lived. There he called on Lloyd and told Lloyd in the presence of Lloyd’s father, that he would have to go then and marry the girl or be arrested. Lloyd chose to marry her rather than be arrested. He was clearly guilty of bastardy and knew that he was. We do riot think there was clearly sufficient coercion to constitute ground for annulment of the marriage against the Master’s and Chancellor’s findings to the contrary. So, the order should be, and is, affirmed.
Id. 182 So. at 237-38. This writer could locate no express definition adopted in Florida through Florida Words & Phrases; but The American Heritage Dictionary (1979) defines “coerce” as follows:
*862 1. To force to act or think in a given manner; to compel by pressure or threat.
2. to dominate, restrain, or control forcibly. 3. To actualize by force. — See synonyms at force.
Id. 182 So. at 258.
In State v. Woods, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), the Ohio Supreme Court stated:
Duress usually connotes some degree of force or threat of force, but duress has also been found when the conduct of one person induces another to enter into a contract against his own volition or judgment, generally out of fear, but also in some cases because of extreme persuasion or pressure of circumstances. 13 Williston on Contracts (3 Ed.), Section 1608. Coercion is generally defined more broadly to include undue influence and other lesser forms of compulsion. It has been said that:
“The words ‘coercion’ and ‘duress’ are not synonymous, although their meanings often shade into one another. ‘Duress’ generally carries the idea of compulsion, either by means of actual physical force or threatened physical force applied to the person (or to some near relative of the person) to be influenced, or applied to the property or reputation of such person. ‘Coercion’ may include a compulsion brought about by moral force or in some other manner with or without physical force.” McKenzie-Hague Co. v. Carbide & Carbon Chemicals Corp. (C.A. 8, 1934), 73 F.2d 78, 82. Coercion has been found in a wife’s refusal to return to her husband and resume marital relations (Campbell v. Prater [1948], 64 Wyo. 293, 191 P.2d 160), and in an employer’s warning to striking workers that if they did not return to work by a certain day their jobs would be filled (N.L.R.B. v. Montgomery Ward & Co. [C.A. 9, 1943], 133 F.2d 676).
These judicial definitions of coercion correspond to the common use of the word. Webster’s Third New International Dictionary defines coercion as “the act of coercing: use of physical or moral force to compel to act or assent,” and to coerce as “to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).”
The essential characteristic of coercion which emerges from these definitions is that force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the defendant so that he acted other than he ordinarily would have acted in the absence of those influences.
Id. at 1065-66.
It appears that in Berger v. Berger, 466 So.2d 1149 (Fla. 4th DCA 1985), when we used the word “coercion”, perhaps we should have used the word “duress” when we said:
We certainly agree that the husband had a legal right to actually turn her in to the I.R.S. and that a claim of coercion cannot be predicated on a threat to do an act which the person has a lawful right to do. However as we have already discussed above, the husband does not have the right to threaten to do it for his own pecuniary advantage. See Paris v. Paris, 412 So.2d 952 (Fla. 1st DCA 1982). (emphasis in original)
Id. at 1151. The writer realizes that the terms “duress” and “coercion” have often been used interchangably, but believes a distinction exists between the two.
Again, realizing the limited review mandated by the reasonable person test of Canakaris, the evidence, in the light most favorable to the husband, shows that he had met another woman in Connecticut, with whom he was apparently living at the time of the final hearing; that he admitted his adulterous relationship to his wife; that she prosecuted him with the agreement in question and imposed upon him that her attorney had the husband “over a barrel”; that he got drunk over the weekend after *863 being given the agreement earlier; that he signed it on Monday at the bank, feeling the effects of the heavy drinking; and that he was not a well man, suffering from a form of anemia. The husband adds a characterization of the wife as a constant nag, very heavy drinker, and chronic false accuser before the violation of the marital trust relationship occurred. He adds that the husband was without counsel. This writer was not there to observe the wife or husband over two separate days of final hearing in September and October 1985; so he cannot get a feel for the individual impressions each projected in the trial court’s mind.
The writer agrees with the Third District Court of Appeal that it is not coercion, per se, to execute an agreement without the advice of counsel when the other spouse’s counsel prepared the agreement. Bubenik v. Bubenik, 392 So.2d 943 (Fla. 3d DCA 1980). I hardly recommend such action, however, given the fact that attorneys can best help those spouses who are emotionally caught up in a dissolution because of the attorneys’ freedom from the distortion occasioned by the parties’ emotional involvement.
Taking a hard look at the dictionary definition of “coerce” and with the common sense realization of the emotional trauma of a break-up, coupled with the admonition of Canakaris, the writer can visualize a reasonable person concluding that the husband primarily acted as a result of the wife’s pressure, although the writer would not necessarily agree with the conclusion. The writer is aware of the plurality decision in Hahn v. Hahn, 465 So.2d 1352 (Fla. 5th DCA 1985), wherein the judge writing for the court, said, after alluding to fraud, duress, deceit, coercion and overreaching:
In the instant case, there was no evidence of any of the foregoing elements at the time of the agreement between the parties. The wife did testify, without specifics, that she was “emotionally abused” at the time she signed the agreement, but courts have recognized that it is normal for parties in a dissolution proceeding to be emotionally upset. That emotion is not grounds to set aside an otherwise duly-executed property settlement agreement. See Bailey v. Bailey, 300 So.2d 294 (Fla. 4th DCA 1974).
Id. at 1354. In Bailey, this court held in 1974:
The husband had the burden of proving the wife’s overreaching, Miller v. Miller, 1942, 149 Fla. 722, 7 So.2d 9. The record does not sustain a finding that the husband met his burden. Substantially the only evidence offered in this respect was the husband’s statement that he was under tremendous emotional strain at the time he signed the agreement. This alone is not enough, as “almost all settlements in domestic relation matters are entered during periods of stress”. Bare v. Bare, Fla.App.1960, 120 So.2d 186, 188; Pemelman v. Pemelman, supra, [Fla.App.1966] 186 So.2d [552] at 555.
300 So.2d at 296. Neither Hahn nor Bailey described any act, coercive or otherwise, on the part of the other spouse.
Moreover, the parties here had not separated when the agreement was discussed by them. Accordingly, the termination of trust which this court discussed in Fleming, had not occurred.
The parties have not raised any issue as to whether this is a “true” property settlement; and if so, the ramifications, if any, in the absence of coercion. See, in this regard, Judge Orfinger’s dissent in Hogshead v. Hogshead, 444 So.2d 74 (Fla. 5th DCA 1984). See also O’Connor v. O’Connor, 435 So.2d 344 (Fla. 1st DCA 1983), and Bubenik, supra.
IV
The writer has not discussed the cross appeal — namely, the husband’s desire that we reverse the award of alimony and attorney’s fees — because Canakaris controls and because of the belief that nothing con *864 structive can be accomplished by saying anything further.